United States Court of Appeals,

Eleventh Circuit.

No. 95-6850.

STONE & WEBSTER ENGINEERING CORPORATION, Petitioner,

v.

Alexis HERMAN, Secretary, U.S. Department of Labor, Respondent.

July 2, 1997.

Petition for Review of the Decision and Order of the Secretary of the U.S. Department of Labor.

Before ANDERSON and CARNES, Circuit Judges, and CUDAHY[*], Senior Circuit Judge.

CUDAHY, Senior Circuit Judge:

Made of steel and concrete, the drywell of a nuclear power plant encases the reactor itself. It is the containment structure. It is also a bulwark against a variety of disasters. A fire in a drywell is a serious matter, for extinguishing a fire gone out of control is not easy.

Among the people best positioned to prevent fires are the workers who tend to nuclear plants. But if fear of retaliation kept workers from speaking out about possible hazards, nuclear safety would be jeopardized. To protect whistleblowers, Congress forbade employers from retaliating against employees who act in prescribed ways to ensure safety. 42 U.S.C. § 5851.

This case is about one such alleged retaliation, at the Browns Ferry Project, a three-reactor nuclear plant operated by the Tennessee Valley Authority (TVA) outside Huntsville, Alabama.

---

[*]Honorable Richard D. Cudahy, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

Browns Ferry is no stranger to the danger of fire. In 1975, a fire at the plant failed (narrowly) to cause a meltdown, but did result in the coining of an industry byword for a disastrous conflagration.[1] Further incidents forced the TVA to shut down all three reactors in 1985. In 1991, the Nuclear Regulatory Commission (NRC) let the TVA start up one of the reactors again.[2] And then in 1996, after the events in this case, an unused cooling tower burned up.[3]

There were no fires in this case—yet the issue is fire safety. The TVA engaged the petitioner, the engineering firm of Stone & Webster (S&W), to perform construction and maintenance work at Browns Ferry. The dispute before us was born in the first days of February 1993, when S&W was overhauling the platform steel in the drywell of Unit 3, one of Browns Ferry's three reactors. One of S&W's lead foremen, Douglas Harrison, was working on the drywell upgrade. Harrison complains that S&W first demoted him to plain foreman and then transferred him out of the drywell (a desirable place to work). Each time, he says, S&W was retaliating because Harrison had engaged in protected activity under § 5851: he had spoken out about fire hazards to S&W and TVA officials, as well as to his co-workers.

S&W tells a different story. Harrison did not engage in any

[1]David Stellfox, *Critics Fear Another "Browns Ferry" as NRC Okays Combustible Fire Stops,* Inside N.R.C., Jan. 8, 1996.

[2]Chris Wohlwend, *TVA Restarts Browns Ferry Unit; Ala. Nuclear Plant Shut 6 Years,* Atlanta Journal and Constitution, May 24, 1991, at A2.

[3]Tom Harrison, *Fire Destroys Another Cooling Tower at TVA's Browns Ferry,* Inside N.R.C., May 27, 1996.

protected activity, and even if he did, S&W was not retaliating against him. Harrison's demotion followed from a re-shuffling of the labor force, a common happening at S&W. As for Harrison's transfer out of the drywell, S&W argues that Harrison had been disrupting S&W's drywell project. Under cover of safety concerns, he had incited his fellow iron workers to halt work over a labor dispute. And in any case, even if Harrison did talk about safety with his co-workers, § 5851 does not treat discussions with co-workers as a protected activity.

Harrison filed a complaint with the Department of Labor, which wended its way to the Secretary of Labor. Reversing an Administrative Law Judge (ALJ), the Secretary entered a victory for Harrison. S&W petitions this court to overturn the Secretary of Labor's decision. Why S&W is pursuing the case may seem something of a mystery. The Secretary of Labor ordered S&W to compensate Harrison only for ten weeks' diminished wages at two dollars too little per hour—about $800 by our reckoning—plus Harrison's attorney's fees. For S&W, Harrison is not the point. The NRC is. After S&W lost before the Secretary of Labor, the NRC tentatively adopted the Secretary's finding of retaliation and imposed a civil fine of $80,000, plus other, unspecified enforcement measures. S&W now petitions this court because, if S&W prevails, the NRC states that it will re-consider its actions.

Beyond trying to clarify the evidentiary framework for 42 U.S.C. § 5851, we elaborate one principle with import beyond the doings at Browns Ferry in early 1993. The Secretary of Labor would have us issue a blanket ruling that § 5851 protects an employee's

speech to co-workers. S & W urges the equally broad but opposite rule. But we need not decide today whether § 5851 protects an isolated or private communication, because the circumstances of Harrison's transfer pose, it seems to us, a narrower question: one of viewing acts in context.

We frame it this way. Assume that an employee has already raised the alarm about nuclear safety within the prescribed channels of 42 U.S.C. § 5851. The employer then commits another closely-related and public act of alarm-raising, but this time § 5851 may or may not have protected that act—had it occurred in isolation or as a private communication. Can the employer single out that particular act and punish the employee without fear of sanction under § 5851? We think that to allow the employer to retaliate under these circumstances would thwart the purpose of 42 U.S.C. § 5851. We affirm.

I. Summary of facts

Douglas Harrison had begun working for S&W as an ironworker journeyman in June 1992. Six weeks later he was promoted to foreman, and on October 6, 1992, he advanced to second lead foreman on the drywell project. As part of a routine force reduction in late November of that year, S&W demoted Harrison back to foreman. Harrison recognized that his inferior seniority meant he would be first to be demoted, and he offered no complaint. Then, in early January of 1993, S&W pushed him back up to second lead foreman, again under the same understanding about Harrison's first-to-go seniority. So when the dispute in this case started, Harrison was the number two lead foreman, overseeing the upgrading of one of two

platforms.

On February 1, 1993, Harrison held a weekly safety meeting, one of his job's responsibilities. Harrison's ironworkers had one gripe: firewatch. After wrapping up a shift's hot work, someone had to make sure that no fires broke out, as one might fear with welding gear, cooling steel and the like lying about. Until October 1992, laborers (not ironworkers) had been charged with this duty. Under S&W's new firewatch scheme, ironworkers assumed primary responsibility for the task, although two laborers on a "roving firewatch" would help on each elevation or level of the drywell. At the weekly safety meeting, the ironworkers insisted that the new scheme was unsafe. Afterwards, their foremen told Harrison that the new scheme did not comply with the TVA's fire prevention rules.

Harrison went to tell the TVA fire marshal, Gary Wallace, about the ironworkers' firewatch complaints. Harrison then joined the laborers' lead foreman, David Sparks, and went to talk with Steven Ehele. Ehele was S&W's drywell manager. He had also attended the weekly safety meeting that day. Harrison told Ehele that he had spoken with the TVA fire marshal and that the marshal wanted to talk to Ehele. Ehele, who seems to have a gift for memorable phrases, responded that Harrison and Sparks "were eating [him] alive on man hours in [the] drywell now on fire watches."

*The demotion.* When Harrison arrived at work the next day, February 2, he learned that the firewatch problem remained unresolved. He also learned that Ehele had not contacted fire marshal Wallace, whereupon Harrison went straight to the NRC field

office across the street and filed a complaint with the NRC representative. At about 2:00 pm, one of Harrison's supervisors, Wayne Tennyson (Ehele's subordinate), told Harrison that he had been demoted to foreman.

*The transfer.* At work on the third day, February 3, Harrison said he did not wish to use his seniority to bump a foreman down to journeyman and he voluntarily took a place as a journeyman himself. He also told the ironworkers about his demotion and the failure to resolve their firewatch concerns. The ironworkers then refused to work. Ehele implored them to return to work, which they did. That afternoon, S&W management and union representatives decided that laborers would re-assume full responsibility for firewatch.

Finally, on February 4, Ehele had Harrison removed from the drywell. S&W's job steward for the ironworkers, Larry Morrow, delivered the message to Harrison. Morrow repeated the ever-evocative Ehele's remark that he wanted Harrison transferred because "[Harrison] was a troublemaker, and that [Harrison] was like Moses standing at the Red Sea to the ironworkers in [the] drywell." Harrison would begin ironwork outside the drywell on less prestigious, less essential tasks like putting up chain-link fences. Only Harrison was demoted; only Harrison was transferred.

There is more to this story. Missing are some unpersuasive claims (mostly by S&W), but also some partly exculpatory evidence. We reserve those facts until they fit more neatly into the analysis.

II. Procedural posture

This court offers the third layer of review for this case. In

1993, Harrison filed an administrative complaint with the Wage and Hour Division of the U.S. Department of Labor under 42 U.S.C. § 5851(b). He alleged that both his demotion and his transfer were discriminatory and retaliatory. The Wage and Hour Division sided with S&W, and Harrison appealed. In 1994, the ALJ also came down for S&W. The ALJ found that the demotion was not an adverse action against Harrison on the grounds that it was not discriminatory. The transfer out of the drywell, however, the ALJ did consider to be an adverse action stemming from Harrison's February 3 meeting with his co-workers. But even if the transfer was retaliatory, the ALJ concluded that § 5851(a) did not encompass meeting with co-workers. Section 5851(a) thus did not protect Harrison from that particular act of retaliation. The ALJ recommended dismissal of the case.

Harrison appealed again, this time to the Secretary of Labor. On August 22, 1995, the Secretary reversed the ALJ and found that Harrison's demotion and transfer both constituted retaliation under § 5851(a). As for the demotion, the Secretary found that it had been an adverse action (thus reversing the ALJ), and that it had been retaliatory. With respect to the transfer, the Secretary agreed that it resulted from Harrison's February 3 meeting with his co-workers. The Secretary reversed the ALJ's conclusion that § 5851(a) did not cover such meetings. In the Secretary's judgment, it did.

S&W's timely petition for review followed. We have jurisdiction to review the Secretary's 1995 order under 42 U.S.C. § 5851(c). On matters of law, we review de novo, keeping in mind

the deference we pay to the Secretary of Labor in construing the statutes he is charged with administering. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Bechtel Construction Co. v. Sec. of Labor,* 50 F.3d 926, 931, 933 (11th Cir.1995). On matters of fact, we review the Secretary's order for substantial evidence. 5 U.S.C. § 706(2)(E) (Administrative Procedure Act). We ask whether such relevant evidence exists " "as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). Here the ALJ and the Secretary of Labor differed. This disagreement causes us to review the Secretary's order "more critically." *Bechtel,* 50 F.3d at 933. Ultimately, however, the decision is the Secretary's. *Id.* at 932. We ensure only that the Secretary's conclusion, if different from the ALJ's, is " "supported by articulate, cogent, and reliable analysis.' " *Id.* at 933 (quoting *Northport Health Serv., Inc. v. NLRB,* 961 F.2d 1547, 1553-54 (11th Cir.1992)).

III. Adverse actions against Harrison

Before turning to these happenings at Browns Ferry, a word is in order about how the evidentiary framework of 42 U.S.C. § 5851 operates. The Secretary and S&W have evinced considerable disagreement over the extent to which this framework draws on the general law of employment discrimination. We think it important to dispel some of the seeming perplexity of 42 U.S.C. § 5851.

In 1992, Congress amended § 5851 to codify a particular

framework regarding burdens of proof where no statutory guidance existed before. Energy Policy Act of 1992, P.L. 102-486, § 2902(d); *see also Mackowiak v. University Nuclear Systems, Inc.,* 735 F.2d 1159, 1164 (9th Cir.1984) (upholding similar framework). Under the statutory framework, a complainant must first pass a gatekeeper test before an inquiry may commence. The Secretary may investigate only if the complainant succeeds in making a "prima facie showing" that retaliation for protected activity "was a contributing factor in the unfavorable personnel action alleged in the complaint." 42 U.S.C. § 5851(b)(3)(A). Then the investigation must go forward, unless the employer "demonstrates, by clear and convincing evidence, that it would have taken the same unfavorable personnel action in the absence of such behavior." 42 U.S.C. § 5851(b)(3)(B).

Section 5851's reference to a "prima facie showing" has bred some confusion, chiefly because the phrase evokes the sprawling body of general employment discrimination law. *See, e.g., Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Mt. Healthy City School Dist. Bd. of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The Secretary of Labor and S&W have quarreled over how these cases and their innumerable progeny affect Section 5851's evidentiary burdens. But Section 5851 is clear and supplies its own free-standing evidentiary framework. After a complainant has cleared the prima facie gatekeeper test—and assuming she has not been knocked out by a preemptory "clear and convincing" response

from the employer—the Secretary is to investigate whether the complainant's behavior actually was "a contributing factor in the unfavorable personnel action." 42 U.S.C. § 5851(b)(3)(C). The burden to persuade the Secretary falls upon the complainant, and she must do so by a preponderance of the evidence. *Dysert v. Sec. of Labor,* 105 F.3d 607, 610 (11th Cir.1997). If the complainant succeeds, the employer has a second chance to offer "clear and convincing evidence" that it would have done the same thing anyway, i.e., "in the absence of such behavior." § 5851(b)(3)(D).

For employers, this is a tough standard, and not by accident. Congress appears to have intended that companies in the nuclear industry face a difficult time defending themselves. "Recent accounts of whistleblower harassment at both NRC licensee ... and [Department of Energy] nuclear facilities ... suggest that whistleblower harassment and retaliation remain all too common in parts of the nuclear industry." H. Rep. No. 102-474(VIII), at 79 (1992), *reprinted in* 1992 U.S.C.C.A.N. 1953, 2282, 2297. "These reforms," the House Report continues, "are intended to address those remaining pockets of resistance." *Id.*

We turn to address the specifics of Harrison's demotion and transfer.

A. Harrison's demotion

Under 42 U.S.C. § 5851(b)(3)(C), the burden of persuasion falls first upon Harrison to demonstrate by a preponderance of the evidence that retaliation for his protected activity was a "contributing factor" in the decision to demote him. Harrison cannot satisfy this requirement through direct evidence. S&W did

and said nothing that would indicate it sought to retaliate against Harrison by demoting him on February 2. Drywell manager Ehele did say that Harrison was eating him alive on man-hours. But Ehele's remark does not suggest a desire to suppress Harrison or his complaint. S&W argues that Ehele was talking about over-exposure to radioactivity; and even if Ehele meant wage costs, S&W was not forbidden to consider expenses in weighing safety concerns. That said, the circumstances do seem suspicious. A man starts complaining about fire safety. The next day he is demoted. The Secretary of Labor found that by a preponderance of the evidence, Harrison had made his showing. Reviewing for substantial evidence to support this finding, we affirm.

After hearing his ironworkers' grousing about firewatch, Harrison spoke to the TVA fire marshal, the drywell manager (Ehele) and ultimately to the NRC field representative. If an employee talks about safety to a plant fire official, an employer and an industry regulator, he or she acts squarely within the zone of conduct that Congress marked out under 42 U.S.C. § 5851(a)(1). S&W also knew of Harrison's contact with the TVA fire official and with Ehele (though not of Harrison's complaint with the NRC). By February 2, Harrison had told Ehele (his supervisor) of his TVA contact and Ehele obviously knew first-hand of the approach to him. S&W would have us believe that S&W officials thought Harrison was carping about labor issues, but we find this unlikely. Harrison's visit to the TVA fire marshal should have put at least Ehele on notice of Harrison's § 5851-shielded conduct.

So far the ALJ and the Secretary were in agreement. When they

considered whether demotion was an adverse action, however, they parted ways. The ALJ decided that the demotion was not an adverse action because the demotion, in the ALJ's eyes, was not discriminatory. But discriminatory and adverse have distinct meanings. An "adverse action" is simply something unpleasant, detrimental, even unfortunate, but not necessarily (and not usually) discriminatory. The Secretary corrected this error and concluded that Harrison's demotion was an adverse action.

In determining whether Harrison met his burden under § 5851(b)(3)(C), we ask whether the Secretary properly inferred that retaliation against Harrison was more likely than not a "contributing factor" to his demotion. The Secretary said yes, for only one day separated Harrison's protected conduct from his demotion. Given this proximity in time and the circumstances as laid out above, we see no grounds for gainsaying the Secretary's inference of causation.

The burden thus shifted to S&W to demonstrate, "by clear and convincing evidence, that it would have taken the same unfavorable personnel action in the absence of such behavior." 42 U.S.C. § 5851(b)(3)(B). This is a high standard to begin with; and on review only for substantial evidence supporting the Secretary, S&W has a steep hill to climb.

S&W almost makes it. Its principal argument is to snap the temporal link that the Secretary infers. Five S&W managers offered unimpeached testimony that S&W decided to demote Harrison days before he raised any fire concerns. For in late January the field manager for all construction work at Browns Ferry, James Butts, had

reviewed the roster of drywell employees.  Butts surmised that the project was top-heavy:  the ratio of foremen to ironworkers was 9:38, double the 1:8 ratio that S&W generally targets.  On either January 27 or 29, Butts asked his subordinates, including Ehele, to review their rosters for top-heaviness.  Ehele turned to his own subordinate managers (Tennyson, Sertway, and Fonte) for suggestions, but named no one himself.

Ehele's subordinates picked three foremen:  Tommy Willis, Troy Faulks and Harrison (a lead foreman).  The reasons for picking Harrison were manifold:  Harrison supervised a lone foreman and crew;  the work on his particular platform was drawing to its end; his seniority put him below the other lead foreman, Eugene Hannah. By Saturday, January 30, Ehele had informed field manager Butts of these three recommendations.

But it was not until Tuesday, February 2—after the questions of fire safety had arisen—that Harrison was actually informed of his demotion.  This gap in time introduced the Secretary's critical doubt about S&W's motives.  S&W responds reasonably enough that its managers had bigger matters on their minds than making sure Harrison's demotion was prompt.  But another problem for S&W is that of the three recommendations for demotion, S&W acted only on Harrison.  The other two, Willis and Faulks, had been slated for reduction to ironworker journeyman.  Ehele's subordinates Tennyson and Sertway intervened on February 2, however, to persuade Ehele and Butts not to demote them, on the grounds that their work was too sophisticated for journeyman's pay.  S&W points out that Harrison was only demoted to foreman at $2 less an hour and would

oversee the same crew in the same location.  Is it plausible that, if S&W wanted to squelch Harrison, it would have chosen such a mild and ineffective technique?  S&W also says that it did not replace Harrison, which supports its contention that Harrison was demoted because of the roster review.

S&W's points are well-taken.  We do not doubt that S&W had legitimate reasons for demoting Harrison.  If the review were de novo, we might agree with S&W that it had met its burden of rebuttal.  In our eyes, S&W might have demoted Harrison had he never uttered a word about fire safety to anyone.  But it is not our task to make this judgment.  Congress has charged us with a much more limited scope of review.  Our task is to determine whether substantial evidence supports the Secretary's decision.  We agree with the Secretary that such evidence exists.  We cannot say that it was unreasonable for the Secretary to hold that S&W had failed to rebut under § 5851(b)(3)(D).

B. Harrison's transfer

The circumstances of Harrison's transfer out of the drywell are less muddled.  On February 3—after his demotion—Harrison asked the remaining lead foreman, Eugene Hannah, to gather the members of Harrison's former ironworker crews.  Harrison announced to the assembled workers that he had been demoted and that nothing had changed on the firewatch.  The ironworkers then decided among themselves to refuse to work until S&W rectified the fire safety issue.  Ehele came and mollified them enough to return to work, but later that same day S&W and the union agreed to return to the old firewatch procedure.  Firewatch again became the laborers'

responsibility.

The next day, Ehele sent job steward Morrow to fetch Harrison and send him to work outside the drywell. As we mentioned before, non-drywell work was ancillary, enjoyed less status and seems to have been less interesting. Morrow reported to Harrison that Ehele had compared Harrison to Moses at the Red Sea.

Here Harrison can build his case on direct evidence of S&W's animus. We do not understand Ehele to have underscored Harrison's moral courage. Rather, we think Ehele saw Harrison as a "troublemaker," in Ehele's own words. The Secretary did not err in viewing retaliation as a probable contributing factor to Harrison's transfer out of sight and out of the drywell.

Against Harrison's evidence S&W offers little in rejoinder. Ehele mentions that Harrison had earlier requested a transfer to an outside crew. This is a plausible contention, as Harrison, now working as a journeyman, might prefer not to work alongside people he had just recently supervised. But S&W falls short of convincing us, as he failed to convince the ALJ or the Secretary, that S&W would have transferred Harrison had he never provoked trouble for S&W at the ironworkers' meeting. Substantial evidence upholds the Secretary's finding of retaliation.

Our conclusion leaves an assumption hanging. Section 5851 does not protect every act that an employee commits under the auspices of safety. Whistleblowing must occur through prescribed channels. Did Harrison's advising his co-workers of his fire worries constitute a protected activity under § 5851(a)? If not, the whistleblower provision would not avail Harrison, and S & W's

retaliation would be permissible.  We are unaware of any case law that guides our response to this particular question.  We decide it afresh today.

Section 5851(a) lists six ways that an employee may act under its aegis.  Listing only the three relevant provisions, an employee commits a protected activity if he:

> (A) notified his employer of an alleged violation of this chapter or the Atomic Energy Act of 1954....

> (D) commenced, caused to be commenced, or is about to commence or cause to be commenced a proceeding under this chapter or the Atomic Energy Act of 1954, as amended, or a proceeding for the administration or enforcement of any requirement imposed under this chapter or the Atomic Energy Act of 1954, as amended [or] ...;

> (F) assisted or participated or is about to assist or participate in any manner in such a proceeding or in any other manner in such a proceeding or in any other action to carry out the purposes of this chapter or the Atomic Energy Act of 1954, as amended.

We note as a starting point that Congress drafted subparagraph (F) in broad terms.  The statute shields any employee who "is about to assist or participate in any manner ... or in *any other action* to carry out the *purposes* of this chapter or the Atomic Energy Act of 1954, as amended."  42 U.S.C. § 5851(a)(1)(F) (emphasis added).  "Purpose" is an open-ended word.  We presume that Congress used this word advisedly.  In fact, when Congress revised § 5851 wholesale in 1992, it left this wording intact.  *See* 42 U.S.C. § 5851(a)(3) (1991).

The Secretary of Labor argues that § 5851(a) is elastic enough to cover Harrison's speech to his co-workers.  The Secretary administers § 5851, and we accord his or her interpretations due deference.  *English v. General Electric Co.,* 496 U.S. 72, 83 n. 6,

110 S.Ct. 2270, 2277 n. 6, 110 L.Ed.2d 65 (1990); *Bechtel,* 50 F.3d at 932. In *Bechtel,* this court acceded to the Secretary's contention that the pre-1992 version of § 5851 covered internal complaints "made to supervisors and others," a position Congress ratified with the current statute's subparagraph (A). *Id.* at 932, 932 n. 1. As in *Bechtel,* we ask whether the Secretary's reading is a permissible reading of the statute. *Id.* at 932.

We do not need to adopt as broad a reading of the statute as the Secretary would wish, however. The facts of Harrison's transfer permit a less ambitious decision. Harrison's discussion with his fellow ironworkers was, in the context in which it occurred, an action "to carry out the purposes" of the Atomic Energy Act and Chapter 73 of Title 42 (Development of Energy Sources)—and to guarantee nuclear safety in particular. Harrison may very well have been wrong about the concrete dangers posed by the new firewatch scheme at Browns Ferry. We do not know. The important question, however, is not whether he was right, but whether he was acting in furtherance of safety compliance when he spoke to the co-workers. We conclude he was. The meeting with the ironworkers was included in a series of communications to employer representatives and to TVA officials. All of these complaints were, under the circumstances, mutually reinforcing. The meeting with the ironworkers reiterated publicly and in an emphatic way what Harrison had said in the earlier communications. As a practical matter, Harrison's statements at the meeting served as another notice to the employer. To exclude the meeting as a recognized effort at whistleblowing would seem artificial; to

denude the meeting of its context would seem to strip it of its real content. In a context directly and immediately involving other communications that § 5851(a) explicitly recognizes as protected activity, the Secretary of Labor has permissibly construed § 5851(a) to include Harrison's meeting with his co-workers.

S&W retorts that this position ignores that Congress felt it necessary in 1992 to insert a particular sub-paragraph to cover internal complaints to employers. 42 U.S.C. § 5851(a)(1)(A). If Congress inserted a provision for speech to employers, why not for speech to fellow employees? Because, S&W says, Congress did not want to extend protection this far. S&W's interpretation is not implausible on its face. At the time of the 1992 amendments, several circuits had ruled that § 5851(a) encompassed complaints to employers. *Bechtel,* 50 F.3d at 931-32 (recounting history of case law). Nonetheless, the Fifth Circuit had ruled the other way. *Brown & Root, Inc. v. Donovan,* 747 F.2d 1029 (5th Cir.1984). The legislative history of the 1992 Energy Policy Act, too, makes clear that Congress intended the amendments to codify what it thought the law to be already. Congress sought "to *explicitly* provide whistleblower protection for nuclear industry employees [who] (1) notify their employer of an alleged violation rather than a federal regulator." H.R. No. 102-474(VIII), at 78, *reprinted in* 1992 U.S.C.C.A.N. 1953, 2282, 2296 (emphasis added). In other words, Congress thought the statutory language broad enough already, but recognized that it required explication.

We recognize that the policy implications of the Secretary's

construction may not be flawless. There may be some difficulty in distinguishing between offering a shield behind which some employees may incite trouble about a host of non-safety issues, including labor disputes, and one behind which well-intentioned employees may raise an alarm against safety hazards. But this is a balance for the Secretary of Labor to attempt to strike in the first instance. The only question is whether the Secretary's balance here, as we have cast it, is a permissible reading of the whistleblower provision. We think it is.

IV. Conclusion

The Secretary of Labor found that Stone & Webster impermissibly retaliated against Douglas Harrison at Browns Ferry in February 1993, first through demotion and then through transfer. On the facts, we decide that substantial evidence supports the Secretary's finding. On the law, we uphold the Secretary's interpretation of § 5851(a) as shielding the expression of safety-related concerns to fellow workers, when, as here, that expression has a public dimension and fits closely into an extended pattern of otherwise protected activity.

AFFIRMED.