**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-2148
_____

ANTHONY ARAUJO,

Appellant

v.

NEW JERSEY TRANSIT RAIL OPERATIONS, INC.

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 2-10-cv-03985)
District Judge: Hon. Stanley R. Chesler
_____

Argued December 14, 2012

BEFORE: GREENAWAY, JR., GREENBERG and
COWEN,  Circuit Judges

(Filed: February 19, 2013)

Charles C. Goetsch, Esq. (Argued)
Cahill, Goetsch & Perry
43 Trumbull Street
New Haven, CT 06510

       Counsel for Appellant

Adam K. Phelps, Esq. (Argued)
Office of Attorney General of New Jersey
Department of Law & Public Safety
One Penn Plaza East, 4th Floor
Newark, NJ 07105

       Counsel for Appellee

_____

OPINION
_____

COWEN, Circuit Judge.

       Anthony Araujo filed a complaint in the United States District Court for the District of New Jersey alleging that he was disciplined by New Jersey Transit Rail Operations, Inc. ("NJT") in retaliation for his participation in an activity protected by the Federal Rail Safety Act, 49 U.S.C. § 20109 ("FRSA"). Specifically, Araujo reported an emotional injury after he witnessed a fatal accident on February 25, 2008. The District Court (Judge Stanley R. Chesler) found that the discipline was not retaliatory and granted NJT's motion for

2

summary judgment. *See Araujo v. New Jersey Transit Rail Operations, Inc.*, No. 10-CV-3985, 2012 WL 1044619 (D.N.J. Mar. 28, 2012). We will reverse the order of the District Court and remand.

I.

As this appeal arises from the grant of NJT's motion for summary judgment, we recount the facts contained in the record in the light most favorable to Araujo, the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

NJT employs outside contractors to conduct repairs and maintenance work on bridges that pass over railroad tracks that are electrified by NJT. They are primarily protected from overhead high voltage catenary wires by two NJT linemen, and are protected from the movement of other trains on the tracks by a conductor-flagman. Prior to the February 25, 2008 accident, it was the practice of linemen not to talk to the NJT conductor-flagman about catenary outages. Rather, linemen would brief the supervisor of the contractor crew about the extent of the electrical catenary outages. The supervisor of the contractor crew would then inform the conductor-flagman that the catenary lines were de-energized. On the date of the accident, Beaver Construction Company ("Beaver Construction"), performed work rehabilitating bridges over an electrified NJT track. The specific area of work was on Track 2, in Newark, New Jersey. NJT employed two linemen—Christopher Picton and Jeff Meisner—to de-energize the catenary and provide primary

3

protection to the contractors. Araujo was the conductor-flagman. His primary responsibility was to protect contractors from oncoming trains.

The linemen told the Beaver Construction superintendent, Nicholas Gilman, that the Beaver Construction crew was supposed to work around Track 2, near Third Street. The linemen did not brief Araujo regarding the limits of the catenary outage, and Araujo concedes that he was not aware of the extent of the catenary outage. Rather, based on his experience as a conductor-flagman, Araujo assumed that the catenary was de-energized to the same extent as the track was put out of service for the repairs. He had received a Bulletin Order—a document used by NJT to describe track outage information—which stated that the track was out of service for electrical trains between Broad Street and Roseville Avenue, an area which included Seventh Street, where the accident occurred. Araujo, however, was mistaken in his assumption that the scope of the catenary de-energization was the same as the track outage. The catenary de-energization was not controlled by the Bulletin Order, but was controlled by another form—the E.T. 102 form—and did not extend that far.

The Beaver Construction crew, accompanied by Araujo, commenced its work at the Third Street area of Track 2. After the crew completed its work, Araujo believed that the construction crew was going to get off of the tracks at the Bathgate Avenue exit ramp, which is past Seventh Street. The two linemen, Picton and Meisner, did not remain with the construction crew, but rather moved to meet the Beaver

4

Construction crew at Bathgate Avenue. Rather than exiting, the Beaver Construction crew foreman, Francis McNeil, asked superintendent Gilman for permission for the crew to stop at Seventh Street to perform minor repairs.

According to Araujo, who heard the conversation between McNeil and Gilman, Gilman told McNeil that he "had the catenary," meaning that he had signed off on the catenary outage with the linemen. Araujo understood this to mean that the catenary was de-energized at Seventh Street. According to Araujo, linemen in practice communicated catenary outages to a conductor-flagman by relaying the information through a construction crew foreman. Thus, at this time, the construction crew, the foreman, and Araujo were not aware that the catenary outage did not extend to Seventh Street. Araujo was the only NJT employee that was with the construction crew. The construction crew proceeded with repairs, and a construction crew member came in contact with the catenary. He was electrocuted, dying from his injuries, which Araujo witnessed.

Following the accident, NJT Superintendent Joseph Meade, who was Araujo's manager, questioned Araujo at the site. He also interviewed others, who confirmed that Araujo had not been briefed about the catenary outage.

The accident was a Federal Rail Administration ("FRA") reportable incident, and both FRA and NJT rules and regulations required NJT to conduct drug tests on any employee that it had "reasonable cause" to believe had committed rule violations that contributed in any way to the

5

incident. On the evening of the incident, NJT administered drug tests to two lineman—Picton and Meisner—who were responsible for protecting the contractors from catenary wires, but did not order a drug test for Araujo.

The following day, Araujo gave a taped statement about the incident to NJT. There was no significant new information in that statement. Araujo also went to NJT's Employee Assistance Program ("EAP") to report symptoms that he was experiencing as a result of witnessing the accident. A NJT counselor confirmed that he was medically unable to work due to a work-related injury, and informed Meade that Araujo could not work. A work-related medical condition that causes an employee to miss work had to be reported to the FRA.

Under the applicable labor relations agreement, NJT had ten days from the date of the incident to give employees notice of a hearing and investigation ("H&I") into rule violations arising out of the incident. On March 5, 2008, Meade drafted disciplinary charges against Araujo, asserting a violation of TRO-3 rules. The TRO-3 rules require conductors to prohibit people under their protection from going near the catenary unless the conductor knows for certain that the catenary is de-energized. Meade admitted during his deposition that, as of the evening of February 25, 2008, he was in possession of all of the information on which he based the TRO-3 rule violation charges against Araujo. He testified, in part:

Q: So what was your basis for deciding to bring

6

the charges?  What information, what facts did you rely on?

A: The fact that the individual came in contact with the catenary wire showed that there was some question on whether [Araujo] followed the rules as outlined in TRO-3, 13, 14, 15 and 101.

Q: You certainly knew that fact as of the afternoon of February 25th, 2008, correct?

A: We knew that the incident happened.  We weren't fully advised in-depth of it, which is why we set up a hearing and investigation to bring all the facts together.

Q: Well, my question to you is—

A: This is not a guilty—this is trying to get all the people involved together and ascertain the facts to see if indeed he did comply with those rules.

Q: Well, why did you suspect or believe that he didn't comply with the rules?  What basis did you have to even believe that?

A: Because an individual was injured under his protection by coming in contact with the catenary.

7

Q: A fact that you knew on February 25, 2008, correct?

A: Yes, sir.

(A-789.) However, Meade also testified that "the fact that we charged Mr. Araujo had nothing to do with the fact that we didn't" drug test him, and stated that the decision to charge Araujo was made after the initial interview on February 25, 2008, and required him to read the statements given by Picton, Meisner, and other witnesses. Additionally, the record reflects that Araujo was the only conductor-flagman that was ever charged with a violation of TRO-3 rules during the five years prior to February 25, 2008. (A-672.)

On May 22, 2008, NJT ceased paying Araujo's wages on the grounds that Araujo's injury was a recoverable injury under the Federal Employers Liability Act ("FELA"). On October 2, 2008, Araujo was cleared to return to work from his injury, but he was suspended without pay while the charges were pending. A hearing was held and the adjudicating officer found that Araujo violated the TRO-3 rules. As a result, Araujo was assessed a time-served suspension without pay.

Araujo thereafter filed a complaint with the Occupational Safety & Health Administration ("OSHA") Office of Whistleblower Protection, as required by the FRSA. OSHA issued findings in favor of Araujo, and ordered NJT to

pay $569,587 in damages, to which NJT objected.[1]  Pursuant to the FRSA, Araujo filed this suit in the United States District Court for the District of New Jersey.[2]  Following discovery, NJT filed a motion for summary judgment, which the District Court granted.  This appeal followed.

## II.

The District Court had jurisdiction pursuant to 49 U.S.C. § 20109(d)(3) and 28 U.S.C. § 1331.  We have

[1] The award included damages for lost EAP benefits ($23,350); lost wages ($40,271); pain and suffering ($5,000); damage to Araujo's FICO credit score ($50,000); the loss of Araujo's car, which was repossessed when he could no longer make payments ($12,297.08); the loss of Araujo's home, which was foreclosed when he could no longer make payments ($345,754.37); punitive damages ($75,000); and attorneys' fees ($17,915).  (A-35.11.)

[2] The FRSA gives authority to investigate and adjudicate whistleblower complaints to the Secretary of Labor.  *See* 49 U.S.C. § 20109(d).  The Secretary of Labor has delegated her authority under this provision to the Assistant Secretary for OSHA.  *See* 29 C.F.R. § 1982.104.  While plaintiffs are required to first lodge a complaint with OSHA, the FRSA permits a plaintiff to bring an action in federal district court "if the Secretary of Labor has not issued a final decision within 210 days after the filing of the complaint and if the delay is not due to the bad faith of the employee."  49 U.S.C. § 20109(d)(3).  Here, the parties agree that the statutory prerequisite was met for Araujo to file his complaint in District Court.

jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. We exercise plenary review over a district court's grant of summary judgment. *See Mabey Bridge & Shore, Inc. v. Schoch*, 666 F.3d 862, 867 (3d Cir. 2012). This court can affirm a grant of summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making its determination, "the court should view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Marzano v. Computer Sci. Corp. Inc.*, 91 F.3d 497, 501 (3d Cir. 1996).

III.

A.

The purpose of the Federal Rail Safety Act ("FRSA") is "to promote safety in every area of railroad operations." 49 U.S.C. § 20101. The FRSA was substantially amended in 2007 to include anti-retaliation measures. Prior to the passage of the FRSA, whistleblower retaliation complaints by railroad carrier employees were subject to mandatory dispute resolution pursuant to the Railway Labor Act, 45 U.S.C. § 151 *et seq*. *See generally* 75 Fed. Reg. 53,523 (Aug. 31, 2010). Congress passed the FRSA amendment in 2007, expanding the scope of the anti-retaliation protections and providing enforcement authority with the Department of

Labor.[3]  Under the newly amended FRSA, a railroad carrier "may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part" to the employee's engagement in one of numerous protected activities.  49 U.S.C. § 20109(a).  The protected activities are enumerated in the statute, and include notifying the railroad carrier of a work-related personal injury or a work-related illness.  *Id.* § 20109(a)(4).

B.

The FRSA incorporates by reference the rules and procedures applicable to Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR-21") whistleblower cases.  *Id.* § 20109(d)(2)(A).  AIR-21 sets forth a two-part burden-shifting test.  *See id.* § 42121(b)(2)(B)(i)-(ii).  Since the FRSA was amended to incorporate the AIR-21 burden-shifting test in 2007, no federal court of appeals has

---

[3] The legislative history of the bill reflects that the changes were intended to "enhance the oversight measures that improve transparency and accountability of the railroad carriers" and that "[t]he intent of this provision is to ensure that employees can report their concerns without the fear of possible retaliation or discrimination from employers."  H.R. Rep. No. 110-259 at 348 (2007) (Conf. Rep.).  For discussion of the changes, *see Santiago v. Metro-North Commuter R.R. Co.*, ARB No. 10-147, slip op. at 12-14; *Norfolk S. Ry. Co. v. Solis*, No. 12-0306, 2013 WL 39226, at *3-4 (D.D.C. Jan. 3, 2013).

considered its application.

Under AIR-21, an employee must show, by a preponderance of the evidence, that "(1) she engaged in protected activity; (2) the employer knew that she engaged in the protected activity; (3) she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action."[4] *Allen v. Admin. Review Bd.*, 514 F.3d 468, 475-76 (5th Cir. 2008). Once the plaintiff makes a showing that the protected activity was a "contributing factor" to the adverse employment action, the burden shifts to the employer to demonstrate "by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior." *Id.* § 42121(b)(2)(B)(ii). The Department of Labor has promulgated regulations that adopt this burden-shifting standard to FRSA complaints filed with the Department of Labor. *See* 29 C.F.R. § 1982.104(e)(3)-(4).

In the past, we have found that if a statute does not provide for a burden-shifting scheme, *McDonnell Douglas* applies as the default burden-shifting framework.[5] *See Doyle*

---

[4] This case is only concerned with the fourth AIR-21 requirement—whether the protected activity was a contributing factor to the adverse employment action. Both parties concede that Araujo engaged in a protected activity; that NJT knew that Araujo engaged in a protected activity; and that Araujo suffered an adverse employment action.

[5] The *McDonnell Douglas* framework is a three-step burden-shifting test that was laid out by the Supreme Court in

12

*v. United States Sec'y of Labor*, 285 F.3d 243, 250 (3d Cir. 2002).  This implies that when a burden-shifting framework other than *McDonnell Douglas* is present in a statute, Congress specifically intended to alter any presumption that *McDonnell Douglas* is applicable.  The FRSA is clear that AIR-21 burden-shifting applies.  However, in this case, the District Court noted that it was unable to locate any binding authority regarding burden-shifting, and discussed both *McDonnell Douglas* and the regulations promulgated by the Department of Labor, 29 C.F.R. § 1982.104(e)(4), which implement the AIR-21 framework.  *Araujo*, 2012 WL 1044619, at \*5.

Ultimately, the District Court concluded that it did not need to determine whether *McDonnell Douglas* applied, or for that matter, whether the AIR-21 framework is distinct from the *McDonnell Douglas* framework, as according to the District Court, Araujo could not satisfy his burden under

---

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The steps have been summarized as follows: "Under *McDonnell Douglas,* a plaintiff must first establish a prima facie case of discrimination. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment action. If the employer meets this burden, the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's explanation is pretextual." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49 n.3 (2003) (citations omitted).

13

either standard.  We disagree with this approach.  The District Court apparently did not recognize that, in fact, the FRSA explicitly incorporates the AIR-21 burden-shifting by reference.  *See id.* ("The parties have not presented any binding authority to the Court concerning how to evaluate the viability of a FRSA whistleblower claim, nor has the Court's own research uncovered any reported cases dealing with FRSA retaliation claims.").  Unquestionably, AIR-21 burden-shifting applies to cases brought under the FRSA.

It is necessary for us to interpret the FRSA burden-shifting scheme.  Statutory analysis begins with the plain language of the statute, "the language employed by Congress."  *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 337 (1979)) (internal quotations omitted).  This Court must give effect to the intent of Congress by giving these words their "ordinary meaning."  *Id.* (internal quotation omitted).  Considering the plain meaning of the statute, FRSA burden-shifting is much more protective of plaintiff-employees than the *McDonnell Douglas* framework.  The plaintiff-employee need only show that his protected activity was a "contributing factor" in the retaliatory discharge or discrimination, not the sole or even predominant cause.  *See* 49 U.S.C. § 42121(b)(2)(B)(ii).  In other words, "a contributing factor is any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision."  *Ameristar Airways, Inc. v. Admin. Rev. Bd.*, 650 F.3d 563, 567 (5th Cir. 2011) (quoting *Allen*, 514 F.3d at 476 n.3 (internal quotation omitted).

14

The term "contributing factor" is a term of art that has been elaborated upon in the context of other whistleblower statutes. The Federal Circuit noted the following in a Whistleblower Protection Act case:

> The words "a contributing factor" . . . mean *any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision.* This test is specifically intended to overrule existing case law, which requires a whistleblower to prove that his protected conduct was a "significant", "motivating", "substantial", or "predominant" factor in a personnel action in order to overturn that action.

*Marano v. Dep't of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993) (quoting 135 Cong. Rec. 5033 (1989) (Explanatory Statement on S. 20)) (emphasis added by Federal Circuit). Furthermore, an employee "*need not* demonstrate the existence of a retaliatory motive on the part of the employee taking the alleged prohibited personnel action in order to establish that his disclosure was a contributing factor to the personnel action." *Marano*, 2 F.3d at 1141 (emphasis in original); *see also Coppinger-Martin v. Solis*, 627 F.3d 745, 750 (9th Cir. 2010) ("A prima facie case does not require that the employee conclusively demonstrate the employer's retaliatory motive.").

Once the employee asserts a prima facie case, the burden shifts to the employer to demonstrate, "by clear and convincing evidence, that the employer would have taken the

same unfavorable personnel action in the absence of that behavior." 49 U.S.C. § 42121(b)(2)(B)(ii). The "clear and convincing evidence" standard is the intermediate burden of proof, in between "a preponderance of the evidence" and "proof beyond a reasonable doubt." *See Addington v. Texas*, 441 U.S. 418, 425 (1979). To meet the burden, the employer must show that "the truth of its factual contentions are highly probable." *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984) (internal quotation omitted).

It is worth emphasizing that the AIR-21 burden-shifting framework that is applicable to FRSA cases is much easier for a plaintiff to satisfy than the *McDonnell Douglas* standard. As the Eleventh Circuit noted in a case under the Energy Reorganization Act, 42 U.S.C. § 5851, a statute that uses a similar burden-shifting framework, "[f]or employers, this is a tough standard, and not by accident." *Stone & Webster Eng'g Corp. v. Herman*, 115 F.3d 1568, 1572 (11th Cir. 1997). The Eleventh Circuit stated that the standard is "tough" because Congress intended for companies in the nuclear industry to "face a difficult time defending themselves," due to a history of whistleblower harassment and retaliation in the industry. *Id.* The 2007 FRSA amendments must be similarly construed, due to the history surrounding their enactment. We note, for example, that the House Committee on Transportation and Infrastructure held a hearing to "examine allegations . . . suggesting that railroad safety management programs sometimes either subtly or overtly intimidate employees from reporting on-the-job-injuries." (Impact of Railroad Injury, Accident, and Discipline Policies on the Safety of America's Railroads:

16

Hearings Before the H. Comm. on Transportation and Infrastructure, 110th Cong. (Oct. 22, 2007)). As the Majority Staff of the Committee on Transportation and Infrastructure noted to members of the Committee:

> The accuracy of rail safety databases has been heavily criticized in a number of government reports over the years. The primary issue identified in many previous government investigations is that the rail industry has a long history of underreporting incidents and accidents in compliance with Federal regulations. The underreporting of railroad employee injuries has long been a particular problem, and railroad labor organizations have frequently complained that harassment of employees who reported injuries is a common railroad management practice.

*Id.*[6] The report noted that one of the reasons that pressure is put on railroad employees not to report injuries is the compensation system; some railroads base supervisor

---

[6] *See also id.* (Introductory Remarks of Rep. Oberstar) ("Reports have documented a long history of under-reporting of accidents, under-reporting incidents, of noncompliance with Federal regulations; and under-reporting of rail injuries is significant because employees frequently report that harassment of those who do report incidents, being hurt on the job, is a common practice in the rail sector.".)

compensation, in part, on the number of employees under their supervision that report injuries to the Federal Railroad Administration. *Id.* We will leave our discussion of the legislative history here, as the AIR-21 burden-shifting language is clear, and "[w]here the statutory language is unambiguous, the court should not consider statutory purpose or legislative history." *See In re Phila. Newspapers, LLC*, 599 F.3d 298, 304 (3d Cir. 2010). We simply note this history to emphasize that, as it did with other statutes that utilize the "contributing factor" and "clear and convincing evidence" burden-shifting framework, Congress intended to be protective of plaintiff-employees.

## C.

We must now apply AIR-21 burden-shifting. First, Araujo must show, by a preponderance of the evidence, that his reporting of his injury was a "contributing factor" to NJT's decision to discipline him. If he can do so, NJT must show by "clear and convincing evidence" that it would still have disciplined him, absent the reported injury. The District Court held that Araujo "cannot establish a prima facie case of retaliation because the record lacks evidence from which a reasonable factfinder could infer that the protected activity—Araujo's reports of employee injury—was a contributing factor in NJT's decision to discipline Araujo for the Electrical Operating Rules he violated in the February 25, 2008 incident." *Araujo*, 2012 WL 1044619, at *6.

But, Araujo identifies some evidence in the record that tends to show that his decision to report a workplace injury

18

was a contributing factor to NJT's decision to initiate disciplinary proceedings against him. His evidence principally falls into two categories: (a) temporal proximity and (b) adverse disparate treatment. While this Court notes that the evidence that Araujo proffers is certainly not overwhelming, we part ways with the District Court, and hold that it is sufficient to assert a prima facie case.

Temporal proximity between the employee's engagement in a protected activity and the unfavorable personnel action can be circumstantial evidence that the protected activity was a contributing factor to the adverse employment action. *See Kewley v. Dep't of Health and Human Servs.*, 153 F.3d 1357, 1362 (Fed. Cir. 1998) (noting that, under the Whistleblower Protection Act, "the circumstantial evidence of knowledge of the protected disclosure and a reasonable relationship between the time of the protected disclosure and the time of the personnel action will establish, *prima facie*, that the disclosure was a contributing factor to the personnel action") (internal quotation omitted). Araujo is able to show evidence of temporal proximity by marshalling the following facts in the record. On February 25, 2008 (the night of the accident), Meade decided not to drug test Araujo, despite the fact that he was legally required to drug test Araujo if he suspected that he had violated a rule or contributed to the accident. On that night, Meade had drug tests administered to Picton and Meisner. On the next day, February 26, 2008, Araujo went to NJT's EAP Counselor to report that he was experiencing symptoms related to the incident. Araujo was deemed unable to work due to the work-related injury. A few days after

19

Araujo reported the injury, Meade filed disciplinary charges against Araujo. Araujo contends—and the record provides support—that Meade had all of the information related to Araujo's involvement on February 25, 2008, and duly, cause to drug test him if he had thought it necessary.

NJT provides at least three reasons that this Court should disregard the temporal proximity. First, Meade testified that "the fact that we charged Mr. Araujo had nothing to do with the fact that we didn't" drug test him, and stated that the decision to charge Araujo came later, after he had read the statements given by Picton, Meisner, and other witnesses. NJT also notes that Araujo was actually charged before Picton and Meisner. Additionally, NJT emphasizes that under the applicable collective bargaining agreement, NJT had only ten days from the incident to give Araujo notice of a hearing and investigation. Thus, according to NJT, the temporal proximity was present "by necessity," due to the agreement. (Appellee's Br. at 21.)

Araujo also points to disparate treatment as circumstantial evidence that his protected activity was a contributing factor to his adverse employment action. Specifically, Araujo points to the fact that, in the five years preceding the February 25, 2008 incident, no other conductor-flagmen were disciplined for violating the TRO-3 rules. According to Araujo, prior to the accident, it was common practice for conductor-flagmen not to talk to the linemen, and thus be unaware of the extent of the catenary power outages. NJT responds, asserting that Araujo was not treated disparately as compared to Picton and Meisner, who were

20

disciplined for their conduct during the accident. NJT also asserts that Araujo should not be compared to other conductor-flagmen, because Araujo is the only conductor-flagman to ever allow a contractor to come into contact with a live catenary while under his protection.

Considering all of the evidence in the light most favorable to Araujo, we conclude that Araujo has asserted a prima facie case. With respect to Araujo's temporal proximity argument, Araujo's evidence is entirely circumstantial, and he does not provide any evidence about NJT's motive. But direct evidence is not required. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (noting, in the context of Title VII employment discrimination cases, that "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence"). Thus, Araujo is not required to provide evidence

21

of motive.[7]  *See Marano*, 2 F.3d at 1141 (noting, in a case under the Whistleblower Protection Act, that an employee "*need not* demonstrate the existence of a retaliatory motive on the part of the employee taking the alleged prohibited personnel action in order to establish that his disclosure was a contributing factor to the personnel action" (emphasis in original)).

Viewing the facts favorably to Araujo, a reasonable jury could find that Meade decided not to drug test Araujo on February 25, 2008 because he did not believe that he violated any rules or was responsible for the accident, and that NJT decided to file disciplinary charges only after Araujo reported his injury.  Certainly, this evidence is not overwhelming.  We note that the District Court found that this theory suffers from a "critical flaw" in that it conflates the protocol for drug testing with the internal process by which NJT investigates

---

[7] We note that the fact that an employee need not ascribe a motive to the employer greatly reduces an employee's burden in making a prima facie case.  However, we believe that this reduced burden is appropriate in FRSA cases.  We note, for example, that the legislative history shows that Congress was concerned that some railroad supervisors intimidated employees from reporting injuries to the FRA, in part, because their compensation depended on low numbers of FRA reportable injuries within their supervisory area.  (Impact of Railroad Injury, Accident, and Discipline Policies on the Safety of America's Railroads: Hearings Before the H. Comm. on Transportation and Infrastructure, 110th Cong. (Oct. 22, 2007)).

and enforces safety rule violations. *Araujo*, 2012 WL 1044619, at \*7. Thus, the District Court found that, "[t]aken to its logical extreme, Araujo's position would preclude NJT from disciplining any employee through its hearing and investigation procedure if it decided not to subject that employee to a drug and alcohol test in the immediate aftermath of an incident involving an employee injury." *Id.* While we agree that the District Court pointed out a potential flaw in Araujo's theory, viewing the facts in a light favorable to Araujo, whether Araujo's theory suffers from a "critical flaw," or whether retaliation was a contributing factor to NJT's disciplinary decision, is an issue of fact that should be properly considered by a jury, not by the District Court.

We reach the same conclusion with regards to Araujo's disparate treatment arguments, in which Araujo argues that (a) his conduct did not deviate from the general practice of conductor-flagmen at the time and (b) other conductor-flagmen were not disciplined for violating the TRO-3 rules. The District Court accepted NJT's arguments that (a) Araujo should be compared to Picton and Meisner, both of whom were disciplined and (b) Araujo should not be compared to other conductor-flagmen since they were not involved in fatal accidents. Considering all of the evidence in the record, NJT's arguments fail to refute Araujo's assertion that his actions were in line with NJT practice at the time of the accident. If we view the facts in the light most favorable to Araujo, conductor-flagmen generally were not aware of the extent of catenary outages. Thus, Araujo is not comparable to Picton and Meisner, as both are linemen who were responsible for the catenary. Similarly, while Araujo may

23

have been the only conductor-flagman to have been on duty during a fatal accident, it is not appropriate to put him in a class by himself, and not compare him to other conductor-flagmen who did not know about catenary outages but were not on duty during fatal accidents. Applying the employee-friendly AIR-21 standard, Araujo has stated a prima facie case of retaliation.

Having found that Araujo made a prima facie case, the burden shifts to NJT to show by "clear and convincing evidence" that it would have disciplined Araujo in the absence of his decision to report his injury. The District Court found that, assuming that Araujo could state a prima facie case, NJT was able to show by clear and convincing evidence that it would have disciplined him anyway. NJT appears to make two categories of arguments in an attempt to show clear and convincing evidence. First, as discussed in the preceding section, NJT attempts to rebut many of Araujo's proffered arguments. Second, NJT provides independent evidence that Araujo did in fact violate the TRO-3 rules. We conclude that NJT is unable to sustain its steep burden.

NJT attempts to rebut Araujo's proffered facts with respect to temporal proximity and disparate treatment. For the reasons discussed above, NJT's rebuttals to Araujo's arguments do not provide "clear and convincing evidence." We note that the result may be different if the *McDonnell Douglas* burden-shifting framework was applicable to this claim. Under *McDonnell Douglas*, the employer need only articulate a legitimate, non-discriminatory reason for the

24

action. We need not decide whether NJT's responses to Araujo's arguments are legitimate, nondiscriminatory reasons for NJT's decision to discipline Araujo. We note this solely to emphasize the steep burden that employers face under the AIR-21 burden-shifting framework.

NJT also attempts to provide "clear and convincing evidence" by making a case that Araujo was actually in violation of the TRO-3 rules. NJT points to evidence in the record that Araujo was aware that the TRO-3 rules broadly do not permit NJT employees to allow people under their protection near the catenary unless the employee knows for certain that the catenary is de-energized. (Appellee's Br. at 8.) Further, Araujo admitted that he was not aware whether the catenary was energized before the accident. NJT points out that Araujo correctly answered a question on an exam in 2006, showing that he knew that a conductor-flagman protecting contractors can allow the contractor to work on an overhead bridge in electrified territory only when the Class "A" employee reports to the conductor-flagman that the catenary is de-energized and partially grounded. (Appellee's Br. at 10.)

The District Court found that this evidence of Araujo's actual violation of the TRO-3 rules presented "clear and convincing evidence" that NJT's actions were not retaliatory. *See Araujo*, 2012 WL 1044619, at *9 ("[T]he evidence in the record demonstrates that discipline was legitimately imposed on Araujo as a result of his violation of several electrical safety rules with tragic consequences."). We disagree. While the facts in the record may show that Araujo was technically

25

in violation of written rules, they do not shed any light on whether NJT's decision to file disciplinary charges was retaliatory. As discussed, Araujo argues that he was following the practice that all conductor-flagmen followed at the time, and that NJT had never previously disciplined any conductor-flagmen for TRO-3 rule violations. While Araujo does not concede that he violated the letter of the TRO-3 rules, there is evidence in the record that Araujo did not know the extent of the catenary outage and was the only NJT employee directly supervising the contractors prior to the accident. Assuming for a moment that Araujo violated the letter of the TRO-3 rules, Araujo nevertheless argues that NJT's actual on-the-ground practices differed from the written rules, and NJT acknowledged this by never enforcing the rules against conductor-flagmen. Viewing Araujo's argument in this context, NJT's arguments that Araujo committed an actual violation of the letter of the TRO-3 rules does not shed any light on whether NJT's decision to enforce these rules against a conductor-flagman for the first time was retaliatory.

We emphasize that Araujo has not articulated an overwhelming case of retaliation. He has not, for example, proffered any evidence that NJT dissuaded him from reporting his injury or expressed animus at him for doing so. Araujo's evidence is entirely circumstantial, and we express no opinion as to the strength of his evidence. We only note that by amending the FRSA, Congress expressed an intent to be protective of plaintiff-employees. Applying the AIR-21 burden-shifting framework, Araujo has shown enough to survive NJT's motion for summary judgment.

## V.

For the foregoing reasons, we will reverse the March 28, 2012 order of the District Court, and remand to the District Court for further proceedings.