Thomas W. RAY, Plaintiff,

v.

**UNION PACIFIC RAILROAD COMPANY, Defendant.**

No. 4:11–cv–334.

United States District Court,
S.D. Iowa,
Central Division.

Sept. 13, 2013.
Order Denying Motion to Amend
Nov. 14, 2013.

Charles A. Collins, Charles A. Collins PA, St. Paul, MN, Karin R. Zeigler, Zeigler Law Firm PC, West Des Moines, IA, for Plaintiff.

Bruce E. Johnson, Cutler Law Firm PC, West Des Moines, IA, for Defendant.

## ORDER

ROBERT W. PRATT, District Judge.

Before the Court is Union Pacific Railroad Company's ("Defendant" or "UP") Motion for Summary Judgment ("Motion"), filed June 10, 2013. Clerk's No. 21. Thomas W. Ray ("Plaintiff" or "Ray") filed a resistance to the Motion on July 12, 2013. Clerk's No. 26. Defendant replied on July 22, 2013. Clerk's No. 27. The matter is fully submitted.[1]

## I. FACTUAL BACKGROUND

Plaintiff began working for Defendant on June 17, 1996. Def.'s Statement of Undisputed Material Facts in Supp. of Its Mot. For Summ. J. ("Def.'s Facts") (Clerk's No. 21.2) ¶ 1. At the time of Plaintiff's dismissal on December 30, 2009, he was employed as assistant foreman in Defendant's track repair department in Boone, Iowa. *Id.* ¶ 2. In this position, Plaintiff was represented by the Brotherhood of Maintenance of Way Employees Division, International Brotherhood of Teamsters ("BMWED"). *Id.* ¶ 3.

In April 2008, Plaintiff complained to his physician about pain in both of his knees. *Id.* ¶ 4. Plaintiff was diagnosed and treated for obesity and degenerative arthritis. *Id.* ¶ 5. Over time, Plaintiff's right knee pain worsened and, by 2009, he required surgery to repair it. *Id.* ¶¶ 6–7. In October 2009, Plaintiff informed his supervisor, Jim

Biggerstaff ("Biggerstaff"), that he needed time off work for knee surgery. *Id.* ¶ 8. Biggerstaff asked Plaintiff whether the surgery was related to an on-duty injury, but Plaintiff replied that his surgery was not related to his work at the railroad. *Id.* ¶¶ 9–10. Defendant granted Plaintiff time off and Plaintiff had knee surgery on November 10, 2009. *Id.* ¶ 11.

On November 13, 2009, an attorney contacted Defendant and advised it that Plaintiff claimed to have cumulative knee injuries caused by work and that he was representing Plaintiff in connection with a potential action under the Federal Employers Liability Act ("FELA").[2] *Id.* ¶ 12. On November 19, 2009, Plaintiff reported to Defendant for the first time that his knee condition was work-related and filled out Form 52032, Defendant's required injury report form. *Id.* ¶ 13. One of the questions on Form 52032 was, "When did you first become aware that this condition may have been caused by your work?" *Id.* ¶ 14. Plaintiff's response to the question was a "year ago." *Id.*

Rule 1.6 of Defendant's General Code of Operating Rules ("Code") provides, among other things, that "Employees must not be ... Dishonest." Def.'s Facts ¶ 15; Def.'s App. in Supp. of Mot. for Summ. J. ("Def.'s App.") (Clerk's No. 21.1) at 12 8.[3] Rule 1.2.5 of Defendant's Code provides in pertinent part: "All cases of personal injury, while on duty or on company property, must be immediately reported to the proper manager and the prescribed form completed." Def.'s Facts ¶ 16; Def.'s App. at

---

1. Neither party requested oral argument on Defendant's Motion.

2. Although Plaintiff does not deny this asserted fact, he notes that he was not a party to the conversation and, thus, can neither confirm nor deny that it occurred. Pl.'s Resp. to Def.'s Statement of Undisputed Facts ("Pl.'s Resp. to Def.'s Facts") (Clerk's No. 26.1) ¶ 12.

3. Although some pages of Defendant's Appendix are designated with a page number, the page numbers on the overwhelming majority of pages is "cut off." Accordingly, the Court's citation to page numbers are to the automated page numbers placed in the upper right-hand corner of each page by the CM/ECF filing system.

129. On November 24, 2009, Defendant issued a Notice of Investigation to Plaintiff, charging him with violation of the honesty and late-reporting rules.[4] Def.'s Facts ¶ 18. A hearing was held on December 22, 2009, wherein Plaintiff was represented by BMWED Vice Local Chairman Rod Mulder ("Mulder"). Id. ¶ 19. Five witnesses testified about Plaintiff's injury report, including Biggerstaff. Id. ¶ 20. Mulder cross-examined each witness, was provided an opportunity to present evidence on Plaintiff's behalf, and made a closing argument. Id. ¶ 21. Plaintiff was present for the entire hearing and had the opportunity to present evidence, ask questions, and otherwise speak on his own behalf.[5] Id. ¶ 22.

In his own testimony at the December 22, 2009 hearing, Plaintiff explained that he initially told Biggerstaff that his knee injuries were not work-related because he did not realize until after his surgery, while discussing it with his mother and some coworkers, that his work may have contributed to the wear and tear on his knees.[6] Id. ¶ 23. Plaintiff further testified that he first learned that his knee injury could have been the result of cumulative trauma during this discussion with his mother and coworkers. Id. ¶ 24 At the December 22 hearing, Plaintiff additionally testified that he felt intimidated at the November 19, 2009 meeting where he filled out an injury report. Id. ¶ 25; see Def.'s App. at 101 (Q. "In your meeting on the 19th ... did you feel ... intimidated at all during that meeting?" Plaintiff: "I did, yes. I was very uncomfortable." Q. "Well why—well why would you feel intimidation?" Plaintiff: "Well they ... they put me in a room shut the door and there was three guys standing—standing there looking at me asking question after question after question.").

According to Defendant, its progressive disciplinary policy, known as the "UPGRADE" policy, is designed to ensure that rule violations are consistently addressed. Def.'s Facts ¶¶ 26–27; see Def.'s App. at 10 ("The intent of this policy is to provide a uniform structure to address rule and policy violations in a consistent and fair manner."). The UPGRADE policy provides that "All discipline is determined using the Discipline Assessment Table and Progressive Discipline Table." Def.'s Facts ¶ 28; Def.'s App. at 11. The Discipline Assessment Table separates Defendant's Code into five levels, with Level 1 encompassing minor rule violations and Level 5 encompassing major rule violations. Def.'s Facts ¶ 28; Def.'s App. at

4. Defendant is party to a collective bargaining agreement with BMWED, which provided that workers must be formally charged with a rules violation and an investigatory hearing held before any disciplinary action can be imposed. Def.'s Facts ¶ 17.

5. Plaintiff "dispute[s]" this asserted fact, contending that he "had extremely limited opportunity to present evidence." Pl.'s Resp. to Def.'s Facts ¶ 22. In support of his response, Plaintiff cites generally to the Declaration of Mulder. Id. The Court, however, has reviewed Mulder's declaration and finds no support for Plaintiff's dispute. See Pl.'s App. 1–6; see also Def.'s App. at 93 (Plaintiff responding affirmatively at the December 22, 2009 hearing when asked if he had been "allowed to ask anybody present any question that [he] desired" during the course of the hearing).

6. Plaintiff "dispute[s]" this asserted fact. Pl.'s Resp. to Def.'s Facts ¶ 23. In particular, Plaintiff claims:

> From Mr. Ray's testimony on pages 39–61, it is apparent that he, like all veteran track workers, had a general, visceral sense that the work could have had something to do with it, but his level of understanding and conviction did not reach a point where he felt obligated to report anything until his discussions with co-workers and his mother (who does have significant education).

Id.

16–20. For instance, violations of reporting requirements under Rule 1.2.5 are assessed at Level 3, which results in *"Up to five days* off work without pay or up to one day training without pay. A corrective Action Plan must be developed upon return to work." Def.'s App. at 17. Violations of Rule 1.6 of Defendant's Code, which provides that employees must not be "dishonest," are assessed at Level 5, resulting in "Permanent dismissal."[7] Def.'s App. at 20; *see also* Def.'s Facts ¶ 29–30 (stating that "All level 5 violations require permanent dismissal" and noting that violations of Rule 1.6 are Level 5 violations). Following the December 22 hearing, Defendant's General Superintendent, Karol Burchfield ("Burchfield"), reviewed the transcript and exhibits in light of the UPGRADE policy and determined that Plaintiff had violated both Rule 1.6 and Rule 1.2.5. Def.'s Facts ¶¶ 26, 32. Plaintiff was then dismissed from his employment with Defendant in a letter from Burchfield dated December 30, 2009.[8] *Id.* ¶ 33; Def.'s App. at 143.

Mulder appealed Plaintiff's dismissal on February 2, 2010 in a letter to Defendant's Assistant Director of Labor Relations, Justin Wayne, and requested that Plaintiff be reinstated with back pay and lost benefits. Def.'s Facts ¶¶ 34–35. Wayne reviewed the evidence and upheld Plaintiff's dismissal. *Id.* ¶ 36. BMWED General Chairman Wayne E. Morrow then appealed Plaintiff's dismissal to Defendant's Director of Labor Relations, Brant Hanquist ("Hanquist"), who also reviewed the evidence and upheld Plaintiff's dismissal. *Id.* ¶¶ 37–38. Eventually, Defendant's representatives met with BMWED representatives to attempt to resolve Plaintiff's claim and the case was referred to a Public Law Board ("PLB") for arbitration under the Railway Labor Act ("RLA").[9] *Id.* ¶¶ 39–40.

While Plaintiff's RLA claims was pending, Defendant deposed Plaintiff in connection with a FELA claim that he had filed in Iowa state court.[10] *Id.* ¶ 41. On January 4, 2012, Plaintiff testified that he knew as early as 2008 that his work activities were causing his knee problems and that he waited at least a month to report his injury. *Id.* ¶¶ 42, 44. Plaintiff also testified that he had a good relationship with his supervisors, Biggerstaff always treated him well, and that during the November 19, 2009 meeting where he filled out an injury report, "everything was just fine" and there was a "nice discussion." *Id.* ¶¶ 45–46. Nevertheless, Plaintiff also testified that he did not tell Biggerstaff that his injury was work-related because he feared losing his job.[11] *Id.* ¶ 43.

**7.** Plaintiff contends that the text of the UPGRADE policy speaks for itself, but emphasizes that both the policy's meaning and its implementation are subject to company discretion. Pl.'s Resp. to Def.'s Facts ¶¶ 28–30.

**8.** Defendant claims that, in the Council Bluffs Service Unit where Plaintiff worked, nine employees engaged in dishonest conduct unrelated to an injury report between 2007 and 2009 and all nine were dismissed. Def.'s Facts ¶ 31. Plaintiff disputes this assertion, contending that "Defendant presents incomplete and unreliable information." Pl.'s Resp. to Def.'s Facts ¶ 31.

**9.** "A PLB is composed of a labor member, a railroad member, and a neutral member and is essentially an arbitral tribunal that reviews the outcome of a railroad's investigative hearing to ascertain whether the result is consonant with the terms of the [collective bargaining agreement] between the railroad and its union employees." *Kulavic v. Chi. & Ill. Midland Ry. Co.,* 1 F.3d 507, 513 (7th Cir.1993).

**10.** The parties have stipulated that Plaintiff's deposition in the FELA case "can be used in th[is] federal district court case for all purposes permitted under Federal Rules of Civil Procedure." Def.'s App. at 191.

**11.** Plaintiff's response to almost all of the factual assertions in this paragraph is: "Plaintiff does not dispute the statement so

On April 18, 2013, the PLB issued its determination, concluding that "harassment and intimidation [did not] play[ ] any role in [Plaintiff's] decision not to tell the truth to Manager Biggerstaff in mid-October 2009" and that "substantial evidence was adduced at the Investigation that [Plaintiff] was guilty as charged." Def.'s App. at 183. However, because Plaintiff had "17 years of service with a good work record," the PLB determined that the "discipline was excessive" and reduced it to "lengthy suspension which is corrective in nature and in accordance with [Defendant's] UPGRADE Discipline policy." *Id.* Plaintiff was thus "reinstated to service with seniority intact, all benefits unimpaired, but with no back pay." *Id.* Plaintiff filed the present action on July 18, 2011, asserting claims of "discrimination and retaliation" and "intimidation and chilling effect," in violation of the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109. *See generally* Compl. (Clerk's No. 1).

far as it goes, but it is incomplete and thus misleading." Pl.'s Resp. to Def.'s Facts ¶¶ 42, 43, 45. As to Defendant's claim that Plaintiff waited at least a month to report his injury, Plaintiff responds: "Disputed. His testimony must be read as a whole." *Id.* ¶ 44. As to Defendant's claim about Plaintiff's characterization of the November 19, 2009 meeting, Plaintiff responds: "Disputed. This misrepresents the meeting." *Id.* ¶ 46.

The Court notes that Plaintiff's responses to Defendant's material facts are not compliant with the Court's Local Rules, which provide: "A response to an individual statement of material fact that is not expressly admitted *must be supported by references* to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the resisting party's refusal to admit the statement, *with citations to the appendix* containing that part of the record." LR 56(b) (emphasis added). Plaintiff's counsel is reminded that all litigants in this Court are expected to comply fully with the Local Rules.

## II. SUMMARY JUDGMENT STANDARD

The term "summary judgment" is something of a misnomer. *See* D. Brock Hornby, *Summary Judgment Without Illusions,* 13 Green Bag 2d 273 (Spring 2010). It "suggests a judicial process that is simple, abbreviated, and inexpensive," while in reality, the process is complicated, time-consuming, and expensive.[12] *Id.* at 273, 281. The complexity of the process, however, reflects the "complexity of law and life." *Id.* at 281. "Since the constitutional right to jury trial is at stake," judges must engage in a "paper-intensive and often tedious" process to "assiduously avoid deciding disputed facts or inferences" in a quest to determine whether a record contains genuine factual disputes that necessitate a trial. *Id.* at 281–82. Despite the seeming inaptness of the name, and the desire for some in the plaintiffs' bar to be rid of it, the summary judgment process is well-accepted and appears "here to stay."[13] *Id.* at 281. Indeed, "judges are duty-

12. Indeed, Judge Hornby, a District Court judge for the District of Maine, convincingly suggests that the name "summary judgment" should be changed to "motion for judgment without trial." 13 Green Bag 2d at 284.

13. Judge Hornby notes that over seventy years of Supreme Court jurisprudence gives no hint that the summary judgment process is unconstitutional under the Seventh Amendment. *Id.* at 281 (citing *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 336, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) and *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). While he recognizes that not much can be done to reduce the complexity of the summary judgment process, he nonetheless makes a strong case for improvements in it, including, amongst other things, improved terminology and expectations and increased pre-summary judgment court involvement. *See id.* at 283–88.

bound to resolve legal disputes, no matter how close the call." *Id.* at 287.

Federal Rule of Civil Procedure 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 209 (8th Cir. 1976) (citing *Windsor v. Bethesda Gen. Hosp.*, 523 F.2d 891, 893 n. 5 (8th Cir. 1975)). The purpose of summary judgment is not "to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). Rather, it is designed to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.*, 545 F.2d 1127, 1129 (8th Cir.1976) (citing *Lyons v. Bd. of Educ.*, 523 F.2d 340, 347 (8th Cir.1975)). Summary judgment can be entered against a party if that party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment upon motion after there has been adequate time for discovery. Summary judgment is appropriately granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and that the moving party is therefore entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994). The Court does not weigh the evidence, nor does it make credibility determinations. The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.") (citing *Weight Watchers of Quebec, Ltd. v. Weight Watchers Int'l, Inc.*, 398 F.Supp. 1047, 1055 (E.D.N.Y. 1975)).

In a summary judgment motion, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. If the moving party has carried its burden, the nonmoving party must then go beyond its original pleadings and designate specific facts showing that there remains a genuine issue of material fact that needs to be resolved by a trial. *See* Fed.R.Civ.P. 56(c). This additional showing can be by affidavits, depositions, answers to interrogatories, or the admissions on file. *Id.; Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that

there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the non-moving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* Particularly in the presence of competing cross motions for summary judgment, a court must keep in mind that summary judgment is not a paper trial. Therefore, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994). In a motion for summary judgment, the Court's job is only to decide, based on the evidentiary record that accompanies the moving and resistance filings of the parties, whether there really is any material dispute of fact that still requires a trial. *See id.* (citing *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505 and 10 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2712 (3d ed.1998)).

### III. LAW AND ANALYSIS

The FRSA was enacted in 1970 "to promote safety in every area of railroad operations and reduce railroad-related accidents." 49 U.S.C. § 20101. In 1980, the FRSA was expanded to include protections against retaliation for employees engaged in protected conduct, such as reporting violations of safety laws or refusing to work in hazardous conditions. *See* Fed. R.R. Safety Authorization Act of 1980, Pub. L. No. 96–423, § 10, 94 Stat. 1811 (1980). Disputes over such retaliation were "subject to resolution in accordance with the procedures set forth in section 3 of the [RLA] (45 U.S.C. [§ ]153)." *Id.* § 10, § 212(c)(1). The 1980 amendments also included for the first time an "election of remedies" provision, providing, "Whenever an employee of a railroad is afforded protection under this section and under any other provision of law in connection with the same allegedly unlawful act of an employer, if such employee seeks protection he must elect either to seek relief pursuant to this section or pursuant to such other provision of law." *Id.* § 10, § 212(c)(2)(d).

In 2007, Congress again amended the FRSA to include additional categories of protected conduct. *See* Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. No. 110–53, § 1521, 1221 Stat. 266, 4444 (2007). Pursuant to these 2007 amendments, the FRSA today provides that "railroad carrier[s] ... may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done, or perceived by the employer to have been done or about to be done ... (4) to notify, or attempt to notify, the railroad carrier ... of a work-related personal injury or work-related illness of an employee." *Id.; see* 49 U.S.C. § 20109(a)(4). As well, the 2007 amendments replaced the requirement that FRSA actions proceed through the RLA arbitration process with a provision referring such cases to the Secretary of Labor. Pub. L. No. 110–53, § 1521, § 20109(c). Finally, the 2007 amendments changed the election of remedies language to the present-day language, and added subsections specifying that nothing in the FRSA preempts or diminishes other rights of employees and that the rights provided by the FRSA cannot be waived. *Id.*

§ 1521, § 20109(e)—(g) [14]; *see* 49 U.S.C. § 20109(f) ("Election of remedies.—An employee may not seek protection under both this section and another provision of law for the same allegedly unlawful act of the railroad carrier."); *id.* § 20109(g) ("No preemption.—Nothing in this section preempts or diminishes any other safeguards against discrimination, demotion, discharge, suspension, threats, harassment, reprimand, retaliation, or any other manner of discrimination provided by Federal or State law."); *id.* § 20109(h) ("Rights retained by employee.—Nothing in this section shall be deemed to diminish the rights, privileges, or remedies of any employee under and Federal or State law or under any collective bargaining agreement. The rights or remedies in this section may not be waived by any agreement, policy, form, or condition of employment.").

## A. *Election of Remedies*

Defendant contends that Plaintiff cannot pursue an FRSA claim because he has already challenged his discharge under the RLA. Def.'s Br. in Supp. of Mot. for Summ. J. ("Def.'s Br.") (Clerk's No. 21.3) at 15–20. In particular, Defendant points to § 20109(f) of the FRSA, entitled "Election of remedies," which provides that "[a]n employee may not seek protection under both this section and another provision of law for the same allegedly unlawful act of the railroad carrier." *Id.* at 15. According to Defendant, by bringing an action under the RLA § 3 First, Plaintiff "sought protection" under "another provision of law" for the same "allegedly unlawful act of Defendant" that he challenges in the present action under the FRSA. *Id.* at 15–17. Plaintiff counters that the election of remedies issue has already been decided in that the Administrative Review Board

("ARB"), the highest tribunal in the Department of Labor, rejected the position advanced by Defendant in the consolidated cases of *Mercier v. Union Pacific Railroad* and *Koger v. Norfolk Southern Railway Co.*, Case Nos. 09–121, 09–101, 2011 WL 4915758 (ARB Sept. 21, 2011) (hereinafter *"Mercier"*). *See* Pl.'s Mem. of Law in Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Br.") (Clerk's No. 26) at 12.

In *Mercier*, two separate plaintiffs, Michael Mercier ("Mercier") and Larry Koger ("Koger"), each had their railroad employment terminated in 2007. 2011 WL 4915758, at *2. Each filed a grievance and pursued arbitration under the RLA, and each also filed an FRSA action. *Id.* In Mercier's case, UP sought summary judgment, arguing as it does here that the FRSA's election of remedies provision barred Mercier from pursuing an FRSA claim after already pursuing an RLA claim. *Id.* In Koger's case, Norfolk Southern Railway moved to dismiss Koger's FRSA claim on the same basis. *Id.* at *2–3. Ultimately, the administrative law judge ("ALJ") in Mercier's case determined that the election of remedies provision in § 20109(f) did *not* bar Mercier's claim, while the ALJ in Koger's case determined that the same provision *did* bar Koger's claim. *Id.* UP sought interlocutory appeal, Koger appealed, and the two cases were consolidated for review before the ARB. *Id.*

The ARB concluded that Mercier and Koger's RLA actions did not preclude them from bringing an FRSA action because the RLA actions did not arise under "another provision of law," as required by the election of remedies provision:

> In our view, the plain meaning of "another provision of law" does not encom-

**14.** In 2008, Congress "redesignat[ed] subsections (c) through (i) as subsections (d) through (j)." *See* Pub. L. No. 110–432, § 419, 122 Stat. 4848 (2008).

pass grievances filed pursuant to a "collective bargaining agreement," which is not "another provision of law" but is instead a contractual agreement. This understanding is illuminated by language used in Section 20109(h), which expressly references "a collective bargaining agreement" in describing the application of subsection (h). The fact that a party relies on the law to enforce a right in a collective bargaining agreement is not the same as a right created under a provision of law. *See, e.g., Graf v. Elgin, Joliet and Eastern Railway Co.,* 697 F.2d 771, 776 (7th Cir.1983) ("Nor does the fact than an activity is regulated by a federal statute, as collective bargaining in the railroad industry is regulated by the Railway Labor Act, mean that disputes between private parties engaged in that activity arise under the statute."). Consequently, if the parties' election of remedies defense relies on rights created by a collective bargaining, we do not need to interpret the remainder of the Election of Remedies provision. Nonetheless, further reasoning supports this interpretation of the statute.

First, the amendment to Section 20109, which added subsections (g) and (h) does not change the interpretation of subsection (f) in this case. A grievance and arbitration action provided for in a collective bargaining agreement and enforceable under the RLA does not work to waive the rights and remedies the FRSA affords here. By their terms, sections (g) and (h) anticipate and permit a concurrent whistleblower complaint *and* arbitration provided for in a collective bargaining agreement and enforceable under the RLA. . . . At a minimum, the addition of subsections (g) and (h) to Section 20109 reflect Congress's apparent intent to eliminate any preemption or bar of retaliation claims when there is a concurrent grievance procedure pending under a collective bargaining agreement emanating from the same "unlawful act." [citation omitted]. Thus Mercier's collective bargaining grievance does not preclude his whistleblower complaint under the plain meaning of Section 20109(f).

Next, interpreting Section 20109(f)'s reference to "another provision of law" to *not* encompass grievance procedures under a collective bargaining agreement is underscored in *Alexander v. Gardner–Denver Co.,* 415 U.S. 36 [94 S.Ct. 1011, 39 L.Ed.2d 147] (1974), in which the Supreme Court ... determined that contractual rights are distinct from federal statutory rights, and held that a "contractual right to submit a claim to arbitration is not displaced simply because Congress also has provided a statutory right against discrimination."

. . .

Based on the foregoing interpretation of the FRSA's mandate, (1) we deem nothing in these whistleblower protection provisions as diminishing Mercier's right to pursue arbitration under the collective bargaining agreement between his union and his employer, and (2) we hold that by pursuing arbitration Mercier did not waive any rights or remedies that the FRSA affords him, including the right to pursue a whistleblower complaint under its provisions.

*Id.* at *5–7.

Since *Mercier,* at least two district courts have concluded, as did the ARB, that § 20109(f) does not bar an FRSA action in situations where the plaintiff previously grieved and arbitrated essentially the same claim under the RLA. In *Reed v. Norfolk Southern Railway Co.,* No. 12cv873, 2013 WL 1791694, at *4–5 (N.D.Ill. Apr. 26, 2013), the court found

that arbitration under the RLA "is not an 'election' of a remedy" because the arbitration provisions of the RLA are mandatory and only authorize the arbitration tribunal to hear disputes "arising 'out of the interpretation or application of [collective bargaining] agreements concerning rates of pay, rules, or working conditions[.]' " *Id.* at *4 (quoting 45 U.S.C. § 153(i)). The *Reed* court further found that the DOL's decision in *Mercier* was entitled to *Chevron* deference [15] because "the statute is ambiguous and the [DOL's] interpretation is reasonable," noting both that the DOL has "consistently taken the position that § 20109(f) is not triggered by an employee ... pursuing arbitration under a collective bargaining agreement because a bargaining agreements is a private contract and not another provision of law" and because the DOL's "interpretation avoids the potential conflict between § 20109(f) and § 20109(h)." *Id.* at *5. In *Ratledge v. Norfolk Southern Railway Co.*, No. 1:12–cv–402, 2013 WL 3872793 (E.D.Tenn. July 25, 2013), the court undertook an extensive historical and statutory analysis of § 20109 and concluded that not only is the RLA not "another provision of law" under § 20109(f), but also that the "purpose of the FRSA would be impeded by interpreting the election-of-remedies provision to extend to the RLA." *Id.* at *12–17 (finding as well that the position advocated by the railroad—essentially the same as that asserted by Defendant in the present case— "conflicts with Congress' intent behind the 2007 amendments ... to provide *more* protection to employees"). The *Ratledge* court declined, however, to apply *Chevron* deference, noting that it was unnecessary given that the "Court's interpretation of the statute is the same as the agency's." *Id.* at *18.

■ Although it acknowledges that *Mercier* may be entitled to *Chevron* deference, Defendant nonetheless urges the Court *not* to give the ARB's decision deference "[b]ecause the ARB's reasoning is flawed and its conclusion is incorrect." Def.'s Br. at 18. In particular, Defendant argues that: 1) the RLA is "another provision of law" because "it is well-settled that grievance handling in the railroad industry ... is established and governed by statute, not contract"; 2) §§ 20109(g) and (h) do not create a conflict with § 20109(f); 3) the ARB was incorrect in implying that § 20109(f) is merely a bar on double recoveries; and 4) the ARB was incorrect in implying that § 20109(f) was only meant to bar multiple actions under different federal whistleblower laws. Def.'s Br. at 18–20. The Court has carefully analyzed Defendant's arguments and finds them unconvincing. Indeed, the Court agrees with *Reed* that the language of § 20109 creates an ambiguity, that the ARB's decision is "reasonable," and that *Mercier* is entitled

---

15. In *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, the United States Supreme Court found that courts must defer to administrative interpretations, holding that "a court may not substitute its own construction of a statutory provision for a reasonable interpretation [of that provision] made by the administrator of [the agency entrusted with administration of the statute at issue]." 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Thus, "[i]f a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomm. Ass'n v. Brand X*, 545 U.S. 967, 980, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) (citing *Chevron*, 467 U.S. at 843–44, 104 S.Ct. 2778); *see also Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218, 129 S.Ct. 1498, 173 L.Ed.2d 369 (2009) (stating that the agency interpretation should prevail so long as it is reasonable, even if it is "not necessarily the only possible interpretation, nor even the interpretation deemed most reasonable by the courts").

to deference under *Chevron.* The Court further finds the extensive statutory analysis undertaken by the *Ratledge* court compelling and adopts it herein by reference. Accordingly, the Court agrees with *Mercier, Reed,* and *Ratledge* that Plaintiff's FRSA claims are not barred by the election of remedies provision in § 20109(f) merely because he elected to pursue an enforcement action under the RLA for rights that substantively arise under Defendant's collective bargaining agreement with BMWED.

## B. *Burden–Shifting Framework*

The FRSA provides that an "employee who alleges discharge ... or other discrimination in violation of subsection (a) [prohibiting, among other things, discrimination for notifying an employer of a work-related personal injury] of this section, may seek relief ... by filing a complaint with the Secretary of Labor." 49 U.S.C. § 20109(d)(1). Effective with the 2007 Amendments, the FRSA procedures applicable to the Secretary's review of such a complaint are those set forth in 49 U.S.C. § 42121, the procedures applicable to the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR–21") whistleblower cases (hereinafter referred to as the "AIR–21 procedures"). *See id.* § 20109(d)(2)(A) (providing that such actions "shall be governed under the rules and procedures set forth in section 42121(b), including: (i) burdens of proof.— Any action brought under (d)(1) shall be governed by the legal burdens of proof set forth in section 42121(b)"). That statute provides:

> (B) Requirements.—

> (i) Required showing by complainant.— The Secretary of Labor shall dismiss a complaint filed under this subsection and shall not conduct an investigation otherwise required under subparagraph (A) unless the complainant makes a prima facie showing that any behavior described in paragraphs (1) through (4) of subsection (a) was a contributing factor in the unfavorable personnel action alleged in the complaint.

> (ii) Showing by employer.—Notwithstanding a finding by the Secretary that the complainant has made the showing required under clause (i), no investigation otherwise required under subparagraph (A) shall be conducted if the employer demonstrates, by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior.

> (iii) Criteria for determination by Secretary.—The Secretary may determine that a violation of subsection (a) has occurred only if the complainant demonstrates that any behavior described in paragraphs (1) through (4) of subsection (a) was a contributing factor in the unfavorable personnel action alleged in the complaint.

> (iv) Prohibition.—Relief may not be ordered under subparagraph (A) if the employer demonstrates by clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of that behavior.

49 U.S.C. § 42121(b)(2)(B). In the event the Secretary of Labor has not issued a final decision on such a complaint within 210 days after filing, "the employee may[, as Plaintiff did in the present action,] bring an original action at law or equity for de novo review in the appropriate district court of the United States." 49 U.S.C. § 20109(d)(3).

Since the 2007 amendments, only one court has undertaken significant analysis of the elements needed to sustain a claim under the FRSA. In *Araujo v. New Jersey*

*Transit Rail Operations,* the Third Circuit rejected the typical burden-shifting scheme of *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), finding that Congress's inclusion of the AIR–21 procedures in § 20109 demonstrates that it "specifically intended to alter any presumption that *McDonnell Douglas* is applicable. The FRSA is clear that AIR–21 burden-shifting applies." 708 F.3d 152, 158 (3rd Cir.2013). Thus, the Third Circuit recounted the burden-shifting framework for an FRSA claim as follows:

> Under AIR–21, an employee must show, by a preponderance of the evidence, that "(1) [ ]he engaged in protected activity; (2) the employer knew that [ ]he engaged in the protected activity; (3)[ ]he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Allen v. Admin. Review Bd.,* 514 F.3d 468, 475–76 (5th Cir.2008). Once the plaintiff makes a showing that the protected activity was a "contributing factor" to the adverse employment action, the burden shifts to the employer to demonstrate "by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior." *Id.* § 42121(b)(2)(B)(ii).

*Id.* at 157; *see also In re Hamilton,* No. 12–022, 2013 WL 2146736, at *1 (ARB Apr. 30, 2013).[16]

### 1. Has Plaintiff established a prima facie case?

Defendant contends that Plaintiff cannot establish the first and fourth elements of a prima facie FRSA case. *See* Def.'s Br. at 11 ("[Plaintiff] cannot satisfy his burden of proof as to his FRSA claim based upon the evidence adduced in discovery, both because he cannot show by a preponderance of the evidence that he engaged in protected activity, and because he cannot show that protected conduct contributed to his dismissal."). The Court will address each of these two elements for Plaintiff's prima facie case in turn.

### a. Did Plaintiff engage in a protected activity?

■ As to the first element, whether Plaintiff has shown that he engaged in protected activity, Defendant argues that Plaintiff did not engage in protected activity because he did not make his injury report "in good faith." *Id.* at 11–12. According to Defendant, Plaintiff "changed his story regarding the circumstances of his injury at least four times in two years," thereby precluding a reasonable jury from finding that he acted in good faith. *Id.* at 12. Specifically, Defendant points out that in October 2009, Plaintiff told Biggerstaff that his injury was not work related; in November 2009, he filed an injury report stating that he first became aware that his knee injury was work related a "year ago"; in December 2009, he told Biggerstaff that he was unaware that cumulative trauma could have caused his injury when he informed Biggerstaff that his injury was not work related in October; and in 2012, Plaintiff testified that he told Biggerstaff in October 2009 that his injury was not work related because he feared being fired. Def.'s Br. at 12. According to Defendant, Plaintiff's "lies are so extensive that proving that he was honest at one time merely demonstrates that he was dishonest at another." Def.'s Br. at 13. Plaintiff counters that for purposes of the

---

**16.** Although *Araujo* appears to be the first *court* decision discussing the AIR–21 procedures in any depth, *In Re Hamilton* is only one of a number of agency decisions that discuss the AIR–21 procedures.

FRSA, "the only relevant 'falsity' or 'dishonesty' is whether a work related injury occurred ... when the evidence confirms the employee did in fact suffer a work-related injury, then all other facts are immaterial and any alleged inconsistencies in those facts are immaterial to the FRSA proceeding." Pl.'s Br. at 7.

Defendant is correct that § 20109 prohibits discrimination against a railroad employee when such discrimination is due "in whole or in part, to the employee's lawful, *good faith* act done ... to notify ... the railroad carrier ... of a work-related personal injury." 49 U.S.C. § 20109(a)(4) (emphasis added). This statutory requirement can arguably be read into the first prima facie element, meaning that a railroad employee only "engage[s] in protected activity" under the FRSA if his notification to the employer about a work-related injury is made in good faith. This conclusion is supported by *Walker v. American Airlines*, Case No. 05–028, 2007 WL 1031366 (ARB Mar. 30, 2007), a case Defendant cites in support of its contention that the "FRSA does not protect false or dishonest reports." *See* Def.'s Br. at 11.

In *Walker*, Paul Walker called an airline's hotline and reported that his supervisors had "been intimidating him into signing off on tasks that have not been completed or are not safe just so they can get the plane out." 2007 WL 1031366, at *2. When Walker was interviewed by an investigator, however, he allegedly retracted the charge, "admitting that his hotline call was 'false' in charging that managers knowingly released incomplete or unsafe planes." *Id.* at *3. Walker brought suit under AIR–21, which, as discussed *supra*,

provides the procedures to be used in evaluating an FRSA claim. *Id.* at *1. Following a hearing, the ALJ determined that Walker "did not have a good faith and reasonable basis for making" the allegation about his supervisors and "concluded that the allegation in the hotline call was not protected activity." *Id.* at *7. The ARB affirmed, finding that there was "substantial evidence for the ALJ's finding that Walker's hotline allegation was not in good faith." *Id.* at *12. The ARB went on to state the "provision of 'information' is protected activity only when the complainant actually 'believe[s] in the existence of a violation. Here, the finding that Walker did not make his hotline call in good faith is a finding that Walker did not actually believe the charge he made in that call ... Walker's hotline call cannot qualify as protected activity." *Id.*

There exists a critical distinction between *Walker* and the present case. That is, in *Walker*, Walker knew that the information he provided to the hotline *was false at the time it was provided*. By contrast, other than his initial statement to Biggerstaff in October 2009 that his injury was *not* work-related, Plaintiff has maintained at all times, including when he filed his injury report in November 2009, that his injury *was* work-related. Even though Plaintiff has provided varying accounts about the precise contours of *when* and *how* he realized his injury was caused by his employment, Defendant does not directly challenge Plaintiff's claim that his knee problems were actually work-related.[17]

Section 20109 does not apply the good faith requirement to all of an employee's

---

17. Even if Defendant did challenge whether Plaintiff's injury was work-related, there would, at a minimum, exist a genuine issue of material fact on the issue. *See* Def.'s App. at 180 (PLB decision discussing a December 2, 2009 letter from Plaintiff's physician opining that "Mr. Ray's present employment is probably a contributing factor to arthroscopic findings seen at the time of Mr. Ray's surgery.").

interactions with a railroad. Rather, the phrase "good faith" applies directly to a singular "act done . . . to notify . . . the railroad carrier . . . of a work-related personal injury." 49 U.S.C. § 20109(a)(4). Thus, even assuming that Plaintiff was dishonest with Defendant on one occasion or another, the relevant inquiry remains whether, *at the time he reported his injury* to Defendant, Plaintiff genuinely believed the injury he was reporting was work-related.[18] Under the factual record now before it and taking the evidence in the light most favorable to Plaintiff, a preponderance of the evidence supports a conclusion that Plaintiff did so believe. Accordingly, for purposes of summary judgment, Plaintiff has satisfied the first element of his prima facie case under the FRSA by engaging in protected activity, i.e., by reporting the existence of work-related injury to Defendant in November 2009.

b. *Was Plaintiff's report of his injury a contributing factor in his termination?*

There is no dispute that Defendant was aware that Plaintiff engaged in a protected activity by reported a work-related injury in November 2009. There is also no dispute that Plaintiff suffered an unfavorable personnel action on December 30, 2009 when Defendant terminated his employment. Accordingly, the Court turns to the final contested factor in Plaintiff's prima facie case—whether Plaintiff's protected activity was a contributing factor in the unfavorable action.

"Considering the plain meaning of the statute, FRSA burden-shifting is much more protective of plaintiff-employees than the *McDonnell Douglas* framework." *Araujo*, 708 F.3d at 158. "The plaintiff-employee need only show that his protected activity was a 'contributing factor' in the retaliatory discharge or discrimination, not the sole or even predominant cause." *Id.* (citing 49 U.S.C. § 42121(b)(2)(B)(ii)); *see also Marano v. Dep't of Justice*, 2 F.3d 1137, 1140 (Fed. Cir.1993) (finding under the Whistleblower Protection Act ("WPA") that the contributing factor test "is specifically intended to overrule existing case law, which requires a whistleblower to prove that his protected conduct was a 'significant', 'motivating', 'substantial', or 'predominant' factor in a personnel action in order to overturn that action"). "In other words, 'a contributing factor is any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision.'" *Id.* (citing *Ameristar Airways, Inc. v. Admin. Rev. Bd.*, 650 F.3d 562, 567 (5th Cir.2011)). Plaintiff can establish a prima facie case that his report of a work-related injury was a contributing factor in his discharge by direct or circumstantial evidence. *See Araujo*, 708 F.3d at 160 (holding that neither direct evidence nor evidence of motive is required to prove the contributing factor element) (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003) and *Marano*, 2 F.3d at 1141); *DeFrancesco v. Union R.R. Co.*, No. 10–114, 2012 WL 694502, at *3 (ARB Feb. 29, 2012) ("The contributing factor element of a complaint may be established by direct evidence or

---

**18.** For instance, the fact that Plaintiff has altered the story about *why* he was dishonest with Biggerstaff in October 2009—claiming first that he did not understand cumulative trauma and later claiming that he simply feared losing his job—is of no moment where, as here, the Plaintiff filed an injury report accurately recounting that the cause of his knee injury was work-related. As noted, the focus of the good faith requirement is on the reporting itself, not on all of an employee's interactions with his employer.

indirectly by circumstantial evidence."). Circumstantial evidence that protected activity was a contributing factor in an adverse employment decision may include evidence of:

> temporal proximity, indications of pretext, inconsistent application of an employer's policies, an employer's shifting explanations for its actions, antagonism or hostility toward a complainant's protected activity, the falsity of an employer's explanation for the adverse action taken, and a change in the employer's attitude toward the complainant after he or she engages in protected activity.

*DeFrancesco*, 2012 WL 694502, at *3.

Here, Defendant argues that Plaintiff cannot prove that his report of a work-related injury contributed to his dismissal. Def.'s Br. at 13. According to Defendant, the "undisputed record evidence demonstrates that [Defendant] reasonably believed that Plaintiff was guilty of dishonesty and late reporting, and disciplined him for these rule violations consistent with its discipline policy." *Id.* In particular, Defendant argues:

> Ray's admissions show that he was dishonest about whether or not his injury was work-related. Indeed, Ray's lies are so extensive that proving that he was honest at one time merely demonstrates that he was dishonest at another. If Ray claims that he told the truth in November 2009, when he stated that his injury was work-related, then—as he has admitted—he must have been lying in October 2009, when he told Mr. Biggerstaff that his knee injury was not work-related. Either way, UP reasonably believed that he had been dishonest, properly charged him with dishonesty, and assessed the penalty that its uniformly-applied discipline policy prescribes: dismissal. . . .

Ray's admissions also confirm that UP had ample basis to discipline him for late reporting. Ray conceded that he waited at least a month to report his injury. This delay clearly violates Rule 1.2.5, which states that all cases of occupational illness must be "immediately" reported. This is probably why BMWED conceded that Ray was guilty of late reporting and advised him to accept responsibility for that offense. Even if UP were to accept Ray's original story—that he did not initially report the injury as work-related because he did not know about cumulative trauma—Plaintiff still waited at least six days to report the injury after, according to his testimony, he learned that work-related trauma contributed to it. The evidence demonstrates that UP acted reasonably in finding Plaintiff guilty of late reporting and dishonesty.[19] As a matter of industry practice, an employee can be discharged for both of these offenses.[20] In addition, UP consistently

---

19. Defendant's arguments that it had "ample basis to discipline" Plaintiff and "acted reasonably in finding Plaintiff guilty of late reporting and dishonesty" misses the mark. The present action is not an appeal of the PLB's determination. It is an action under the FRSA, which evaluates *only* whether Plaintiff's filing of a work-related injury report was *a* contributing factor in Defendant's adverse disciplinary decision. Indeed, even if dishonesty and late reporting comprised 99.9% of the reason Defendant discharged Plaintiff, Plaintiff's FRSA actions would still be viable because his injury report could still have been "*a* contributing factor" in the disciplinary action.

20. Regardless of "industry practice" (which is unsupported by any evidence in the record), Plaintiff's late reporting of his work-related injury would not have subjected him to discharge under Defendant's UPGRADE policy. *See* Def.'s App. at 17 (provision of UPGRADE policy providing that "reporting" violations under Rule 1.2.5 are assessed at a Level 3, which is penalized by "[u]p to five days* off

dismisses dishonest employees. UP dismissed Ray consistent with its usual, uniformly-applied policies. He has not demonstrated—and cannot demonstrate—that his injury report contributed to that decision.

Def.'s Br. at 13–15.

Plaintiff counters that the ARB has stressed that contributing causation for purposes of the FRSA analysis "is presumed in situations where the employee's protected activity and the adverse action are 'inextricably intertwined.'" Pl.'s Br. at 7. Various ARB decisions, including *DeFrancesco*, support Plaintiff's assertion in this regard. In *DeFrancesco*, a rail worker reported to his employer a back injury resulting from a slip and fall on December 6, 2008. *DeFrancesco*, 2012 WL 694502, at *1. After watching the video of the alleged incident and reviewing reports, railroad management decided to review the worker's "discipline and injury history to determine whether he exhibited a pattern of unsafe behavior that required corrective action." *Id.* After reviewing the worker's history, the railroad determined that the worker violated two rules by being careless, and violated another rule by virtue of his discipline and injury history. *Id.* The worker was told he could accept the charges against him and be suspended for 15 days without pay, or proceed with an investigative hearing that would likely lead to his discharge. *Id.* at *2. The worker waived the hearing, was suspended for 15 days, and subsequently brought an FRSA action alleging retaliation for reporting a work-related injury. *Id.* Although OSHA [21] determined that the railroad had violated the FRSA, an ALJ reversed that decision, concluding that the worker failed

to demonstrate that his protected activity was a contributing factor in the railroad's adverse action against him. *Id.*

On appeal, the ARB determined "as a matter of law that [the worker's] reporting of his injury was a contributing factor in his suspension." *Id.* at *4. In particular, the ARB held:

> If DeFrancesco had not reported his injury as he was required to do, Kepic [the railroad's superintendent] would never have reviewed the video of DeFrancesco's fall or his employment records. Kepic admitted this at the hearing, testifying that such a review was routine after an employee reported an injury and that the purpose of the review was to determine "the root cause." Kepic stated that after seeing the video he reviewed DeFrancesco's injury and disciplinary records to determine whether there was a pattern of safety rule violations and what corrective action, if any, needed to be taken.
>
> While DeFrancesco's records may indicate a history and pattern of safety violations, the fact remains that his report of the injury on December 6 triggered Kepic's review of his personnel records, which led to the 15-day suspension. If DeFrancesco had not reported his fall and Kepic had not seen the video, Kepic would have had no reason to conduct a review of DeFrancesco's injury and disciplinary records, decide that he exhibited a pattern of unsafe conduct, and impose disciplinary action.

*Id.* at *3–4; *see also Hutton v. Union Pac. R.R. Co.*, No. 2010–FRS–020, 2013 WL 2450037, at *2 (ARB May 31, 2013) ("The ALJ erred in determining that this chain of events does not establish that Hutton's

work without pay or up to one day training without pay").

21. The Department of Labor has delegated its authority under § 20109 to OSHA. *See Araujo*, 708 F.3d at 156 n. 2 (citing 29 C.F.R. § 1982.104).

report of injury was a contributing factor to his discipline measures and ultimate termination. If Hutton had not reported his injury, he would never have been urged and/or required to comply with the provisions of three separate 'return to work' programs—programs specifically created and offered by the employer to address work-place injury. Had he not run afoul of the confusing, if not contradictory, dictates of the several programs, Union Pacific would not have disciplined him."); *Smith v. Duke Energy Carolinas, LLC,* No. 11–003, 2012 WL 2588595, at *7 (ARB June 20, 2012) (finding that a report was a contributing factor to an employee's termination under the Energy Reorganization Act because it was " 'inextricably intertwined' with the investigation that led to his termination ... [t]hough the ALJ found that the termination decision by Smith's managers stemmed solely from Smith's seven-day delay in reporting ... false log signatures, and not on the bare fact that Smith made the report, Smith's act of reporting the information to the managers triggered the decision to terminate him"); *Marano,* 2 F.3d at 1143 (holding that to prove a contributing factor under the WPA, an "employee only needs to demonstrate by a preponderan[ce of the] evidence that the fact of, or the content of, the protected disclosure was one of the factors that tended to affect in any way the personnel action.").

Similarly, in *Henderson v. Wheeling & Lake Erie Railway,* a worker reported two work-related injuries, a back injury allegedly caused by Defendant's equipment and a neck injury allegedly caused by an air bag deploying while the worker was on duty. No. 11–013, 2012 WL 5391422, at *1 (ARB Oct. 26, 2012). The employer launched an investigation and ultimately terminated the worker for a variety of infractions, including for failing to report an injury "not later than the end of tour of duty." *Id.* at *2. In reversing an ALJ decision granting summary judgment to the railroad, the ARB found that since the worker was informed of the investigation a mere four days after he filed his injury report, "temporal proximity between his protected activity and the adverse action is sufficient to raise an inference of causation." *Id.* at *8. The ARB further stated:

> In addition to the temporal proximity, Henderson's evidence supports a presumptive inference that his protected activity and adverse action may be inextricably intertwined, creating a presumptive inference of causation that prevents a summary decision on this issue. We explained recently in *DeFrancesco v. Union R.R. Co.* that causation in FRSA cases like this case creates a difficult obstacle for employers.

> In *DeFrancesco,* ... we held that, if DeFrancesco had not reported his injury, the respondent would not have conducted the investigation that resulted in the discipline. We concluded that DeFrancesco's injury report was a contributing factor in his suspension as a matter of law, and we remanded the case to the ALJ to determine whether the respondent could show by clear and convincing evidence that it would have suspended DeFrancesco in the absence of his protected activity....

> In this case, where no hearing has occurred, the record raises a presumptive inference of causation. If Henderson had not reported his back pain, he would not have been investigated and ultimately fired for failing to fill out a timely injury report. And if he had not claimed that the pain was work-related, he would never have been investigated (and ultimately fired) for failing to exercise occupational safety in connection with his injury. Here, as in *DeFrancesco,* the inference of causation may be

presumed automatically, but as a presumptive inference. This presumption is supported by sound policy reasons. The FRSA's legislative history ... reveals a Congressional intent to comprehensively address the problem of railway retaliation for occupational injury reporting. Effective enforcement of the Act requires presumptive causation under circumstances such as Henderson's, where viewing the "untimely filing of medical injury" as an "independent" ground for termination could easily be used as a pretext for eviscerating protection for injured employees.

*Id.* at *8–9.

■ In the present case, despite initially claiming that his knee injury was not work-related, Plaintiff filed a report with his employer on November 19, 2009 claiming the injury was the result of cumulative trauma. *See* Def.'s App. at 126–27. A mere five days later, Plaintiff was notified to appear for "investigation and hearing" on an allegation that he "changed the reporting of an off duty/ off company property knee surgery to reporting a cumulative trauma, on company property and on duty." *Id.* at 120. According to the notice of investigation and hearing, the "allegations, if substantiated, would constitute a violation of Rule 1.6 (Conduct), and Rule 1.2.5 (Reporting), among others of the General Code of Operating Rules as adopted and modified by Union Pacific." *Id.* As well, the notice informed Plaintiff that if he was "found to be in violation of this alleged charge, the discipline assessment may be a Level 5, and under the Carrier's UPGRADE Discipline Policy may result in permanent dismissal." *Id.* Plaintiff submitted to the hearing and investigation on December 22, 2009, *see id.* at 55–118, and was terminated for "violation of General Code of Operating Rules

1.6, and 1.2.5" on December 30, 2009. *Id.* at 143.

Under these circumstances and the authority recounted above, the Court finds that Plaintiff has demonstrated a genuine issue of material fact as to whether his protected activity was a contributing factor in his termination, both because of the temporal proximity between the report and the subsequent investigation, and because Plaintiff's report is inextricably intertwined with the adverse employment action. *See Araujo*, 708 F.3d at 161 (finding temporal proximity sufficient to establish prima facie contributory causation despite its "entirely circumstantial" nature) (citing *Kewley v. Dep't of Health and Human Servs.*, 153 F.3d 1357, 1362 (Fed.Cir. 1998) (stating that under the WPA, "the circumstantial evidence of knowledge of the protected disclosure and a reasonable relationship between the time of the protected disclosure and the time of the personnel action will establish, *prima facie*, that the disclosure was a contributing factor to the personnel action")). Indeed, just as in *DeFrancesco* and *Henderson*, if Plaintiff had not reported the alleged work-related injury, Defendant would not have undertaken an investigation into either the honesty of Plaintiff's statement to Biggerstaff in October 2009 or the timeliness of Plaintiff's injury report, and Plaintiff would not have been terminated.

2. *Has Defendant demonstrated that it would have taken the same action regardless of Plaintiff's protected activity?*

■ Since Plaintiff has established a prima facie case of FRSA retaliation, the burden of proof shifts to Defendant to show by clear and convincing evidence that it would have terminated Plaintiff regardless of his injury report. As the employer, Defendant faces a "steep burden ... un-

der the AIR–21 burden-shifting framework." *Araujo,* 708 F.3d at 162; *Hutton,* 2013 WL 2450037, at *9 ("A respondent's burden to prove the affirmative defense under FRSA is purposely a high one.... Congress intentionally drafted the burdens of proof ... to provide complainants a lower hurdle to clear than the bar set by other employment statutes."). "Clear and convincing evidence denotes a conclusive demonstration, i.e., that the thing to be proved is highly probable or reasonably certain. Clear and convincing evidence that an employer would have disciplined the employee in the absence of the protected activity overcomes the fact that an employee's protected activity played a role in the employer's adverse action and relieves the employer of liability." *DeFrancesco,* 2012 WL 759336, at *4; *see also Araujo,* 708 F.3d at 159 ("To meet the burden, the employer must show that 'the truth of its factual contentions are highly probable.'" (quoting *Colorado v. New Mexico,* 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984))).

■ Here, Defendant contends that it would have dismissed Plaintiff even if he had not reported an injury. Def.'s Br. at 15. "At UP, the penalty for dishonesty is discharge. UP applies this policy uniformly, regardless of the subject about which an employee is dishonest." *Id.* In support of this contention, Defendant points out that "[i]n the Council Bluffs Service Unit where Ray worked, nine employees engaged in dishonest conduct unrelated to an injury between 2007 and 2009. UP dismissed all nine." *Id.* ("UP has a zero tolerance policy for dishonesty, and it followed this policy with Ray, just as it did with all other employees charged with the same offense in the several years prior to Ray's dismissal."). In support of its assertion, Defendant cites to Hanquist's declaration and the service reports of the nine employees who Defendant claims were discharged for dishonesty. *See* Def.'s App. at 3–7, 29–50.

In his declaration, Hanquist states that under the UPGRADE policy, "dishonesty is classified as a Level 5 offense and results in permanent dismissal. Between 2007 and 2009, nine employees in the Council Bluffs Service Unit were disciplined for dishonest conduct in situations that did not involve injury reports. Of these employees, all nine were terminated from employment." Def.'s App. at 4 (Hanquist Decl. ¶ 6). The employee records show: 1) an employee was terminated October 3, 2008 for violations of "reporting and complying with instructions, "duty-reporting or absence," and "conduct" arising from being "dishonest & fail[ing] to provide documentation for unexcused absences" (Def.'s App. at 29); 2) an employee was terminated June 2, 2009 for violations of "vehicle maintenance," "clearing obstructions," and "conduct," for being "dishonest in failing to properly report a vehicle incident resulting in damage to company vehicle" (*id.* at 32); 3) an employee was terminated effective August 20, 2008 for a "conduct" violation wherein "he was dishonest in regards to his unauthorized possession of Union Pacific property which was not related to his job duties" (*id.* at 33); 4) an employee was terminated February 17, 2009 for a "conduct" violation wherein "he was dishonest when he cheated on his GCOR exam" (*id.* at 34); 5) an employee was terminated September 16, 2010 for a "conduct" violation wherein "he violated the terms of his leniency reinstatement on 08/09/10 when he admittedly failed to comply with the TE & Y attendance policy. His leniency reinstatement required that he fully comply with all the carrier rules, regulations & policies & such compliance was a condi-

tion of his continued employment." [22] (*id.* at 38); 6) an employee was terminated for a "conduct" violation on March 9, 2007 for "act[ing] dishonest & immoral[ly] when he claimed pay not entitled after his duties were completed for the day" [23] (*id.* at 42); 7) an employee was terminated on March 9, 2007 for a "conduct" violation wherein he "acted dishonest & immoral when he claimed pay not entitled after his duties were completed for the day" [24] (*id.* at 46); 8) an employee was discharged on June 17, 2009 for violations of "games, reading and other media" and "conduct" because "he engaged in hostile, malicious, disloyal & dishonest conduct ... he posted false, offensive & unsupported statements of a personal nature about Ms. Burchfield to damage UP's reputations as a safe transport carrier" (*id.* at 48); and 9) an employ-

ee was discharged on May 31, 2007 for a "conduct" violation for being "dishonest when he laid off in ?LY? [sic] military status" (*id.* at 50).[25]

Defendant's own records raise a genuine issue of material fact as to whether employees are uniformly terminated for conduct violations regarding dishonesty. According to the December 30, 2009 letter terminating Plaintiff's employment, Plaintiff was found guilty of violating General Code of Operating Rules 1.6 and 1.2.5. Def.'s App. at 143. Under Defendant's UPGRADE policy, however, only the Rule 1.6 "conduct" violation was subject to a Level 5 assessment that would result in "permanent dismissal." *See id.* at 17 (identifying a Rule 1.2.5 violation as Level 3); *id.* at 20 (identifying a Rule 1.6 viola-

---

22. The description of this event does not reference dishonesty. However, it appears that the "leniency reinstatement" was the result of a "conduct" violation wherein the employee "was engaged in dishonest & fraudulent behavior between 10/24/08 & 03/28/09. There were several occurrences where he used company lodging at both ends of his territory & numerous consecutive hotel stays at his home terminal of Boone, IA at company expense & without authorization." Def.'s App. at 39. For this violation, it appears the employee was *not* discharged; rather, he signed a "leniency reinstatement" and agreed to make restitution, resulting in him being "reinstated 04/17/09 & will be at a level 3 with retention of 18 months from 04/17/09." *Id.* It appears that after being dismissed on September 16, 2010 for failure to comply with the leniency reinstatement, the employee obtained a favorable ruling from a PLB and was returned to service effective November 14, 2011. *Id.* at 38.

23. This employee was reinstated pursuant to an interim PLB award on June 11, 2008. Def.'s App. at 42.

24. It appears this employee was granted a leniency reinstatement and returned to work effective April 5, 2007. Def.'s App. at 46.

25. Plaintiff's resistance brief discussion of these employment records is of little use to

the Court and, in any event, is improper. Plaintiff references "discipline histories for [ ] 14 employees," when Defendant has provided the records of only nine employees. Pl.'s Br. at 9. Plaintiff criticizes Defendant's inclusion of discipline histories for matters *other* than dishonesty when it is clear that Defendant merely included these to provide each employee's complete records. *Id.* As well, Plaintiff makes a good deal of argument about what Defendant has *not* provided, i.e., records of dishonesty violations that were handled informally, but makes no effort to provide relevant records to the Court himself. *Id.* at 8. Most troubling, however, is Plaintiff's attempt to distinguish the disciplinary records Defendant has provided from the present case. *See* Pl.'s Br. at 10–11. In so doing, Plaintiff uses the actual names of disciplined employees even though such information was properly redacted in Defendant's Appendix and Plaintiff discusses individual records without any citation whatsoever that would enable the Court to determine what record is being referenced. *Id.* (by way of example, Plaintiff states that "[o]ne injury report dismissal has facts virtually indistinguishable" from a case included in Plaintiff's appendix, but does not identify the report to which he is referring).

tion as Level 5). In the fifth record articulated above, however, the employee was *not* terminated for the dishonesty violation, but rather was offered a leniency reinstatement, resulting in the case being assessed at a Level 3 rather than at a level 5.[26] *Id.* at 39. As well, in the seventh record articulated above, the employee *was* terminated for the dishonesty violation, but approximately a month later was reinstated to service pursuant to a "leniency reinstatement." *Id.* at 46. These two records alone demonstrate that Defendant does not always permanently dismiss an employee for a dishonesty violation.

Moreover, in resistance to Defendant's affirmative defense, Plaintiff has provided the declaration of Mulder, the now-retired Assistant General Chairman of the Unified System Division of BMWED. Pl.'s App. at 2–7. Mulder attests that he had been a union officer for over ten years at the time of Plaintiff's termination and that it was "common practice for the Union Pacific Railroad and the Council Bluffs Service Unit to discipline an employee who reported an injury." *Id.* at 3. Mulder claims that in his personal experience, it was the "practice that if an employee reported an injury three or so days (or more) after the injury occurred, the employee would almost certainly be charged with being dishonest, and dismissed." *Id.* Mulder also asserts:

> It is not true to say that all Level 5 charges require dismissal. We are told the company can fire anyone charged at Level 5, and often does, but often instead there is a waiver or other deal reducing the charge to level 3 or 4 and the individual. [sic]. This is not unusual

where it is a safety rule violation, or dishonesty with company property, like perhaps tools or supplies. But it is very rare for an employee fired for dishonesty in a personal injury report to be offered a leniency reinstatement, and certainly it almost never happens quickly, say within a month or two. No leniency reinstatement was ever offered to Mr. Ray at any time. [Defendant] adamantly refused, which they usually do with a charge of dishonesty in a personal injury report. That is one way situations like Mr. Ray's do differ in handling from other types of offenses in Level 5.

*Id.* at 6–7. Mulder's declaration, at a minimum, heightens the Court's uncertainty as to whether Defendant *always* terminates employees for dishonesty conduct violations as it contends.

Under the circumstances in this case, and taking the evidence in the light most favorable to Plaintiff, the Court cannot conclude that Defendant has shown by clear and convincing evidence that it would have terminated Plaintiff even if Plaintiff had not filed an injury report. Indeed, the record demonstrates that there are genuine issues of material fact on this question that should properly be resolved by a jury.

### C. *The PLB's Factual Findings*

Defendant's sole remaining argument is that the PLB made several factual findings that are binding on Plaintiff and preclude his FRSA claim. Def.'s Br. at 8–11. Specifically, Defendant contends:

> In deciding Ray's dismissal claim, the PLB made factual findings that are relevant here. First, it decided that Ray

---

**26.** Although the term "reinstatement" implies that a discharge may have occurred, there is nothing in this personnel record that supports a conclusion that the employee was ever *actually* terminated for the violation. Def.'s App. at 39. Indeed, the record reflects that the misconduct occurred between 10/24/08 and 03/28/09, the disciplinary action was filed on April 3, 2009, and the employee signed the "leniency reinstatement" leading to his return to work on April 17, 2009. *Id.*

lied to his supervisor, Mr. Biggerstaff, in October 2009 when he told Biggerstaff that his upcoming surgery was unrelated to an on-duty injury, because "he knew that statement was not accurate." Hanquist Decl. Ex. L, at 6, App. 179. The PLB concluded that "substantial evidence" supported the conclusion that Ray "was guilty as charged." *Id.* at 8, App. 181. Second, the PLB held that it was "not persuaded that harassment and intimidation played any role in [Ray's] decision not to tell the truth." *Id.* at 7–8, App. 180–81.

Def.'s Br. at 8–9. According to Defendant, both the RLA Section 3, First and traditional collateral estoppel principles make these factual findings "binding on [Plaintiff] and dispose of his FRSA claim." *Id.* at 9. Specifically, Defendant asserts the following in support of its claim that it is "impossible" for Plaintiff to prove two elements of his FRSA claim: 1) "To prevail on his FRSA claim, Ray must show that he reported an injury in good faith, and that his injury report contributed to his dismissal. The PLB's conclusion that he lied about the circumstances of his injury precludes a finding that he reported the injury in good faith"; and 2) "Similarly, the PLB's conclusion that substantial evidence supported UP's discipline decision, coupled with the conclusion that management did not harass or intimidate Ray when he reported his injury, completely undermines Ray's ability to prove that his injury report contributed to his dismissal." Def.'s Br. at 10.

Title 45, United States Code § 153 First (m) provides: "The awards of the several divisions of the Adjustment Board shall be stated in writing. A copy of the awards shall be furnished to the respective parties to the controversy, and the awards shall be final and binding upon both parties to the dispute." Defendant makes no particular argument as to how this provision gives preclusive effect to the PLB's "factual findings," other than to state that this provision means that a "PLB's factual findings are binding and may not be relitigated in a later case." Def.'s Br. at 9 (citing *Andrews v. Louisville & Nashville R.R.*, 406 U.S. 320, 325, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972), *Summerville v. Trans World Airlines, Inc.*, 219 F.3d 855, 858 (8th Cir.2000), and *Alexander v. Kan. City. S.R.R.*, 2011–FRS–9 at 5–6 (ALJ May 20, 2011)). Regardless, the Court notes that § 153 First (m) makes reference to "awards" being final and binding, not to specific factual findings. Given the lack of case law or other authority on the preclusive effect of § 153 First (m), the Court finds it prudent to evaluate the issue simply as a matter of collateral estoppel.

The doctrine of collateral estoppel, also known as issue preclusion, provides that "once a court has decided an issue of fact or law necessary to its judgment, the same issue cannot be relitigated in later proceedings." *Winnebago Indus., Inc. v. Haverly*, 727 N.W.2d 567, 571 (Iowa 2006) (citing *Hunter v. City of Des Moines*, 300 N.W.2d 121, 123 n. 2 (Iowa 1981)).[27] Collateral estoppel is designed to "further 'the interest of judicial economy and efficiency by preventing unnecessary litigation,'" and is as well intended to "protect litigants from 'the vexation of relitigating identical issues with identical parties....'" *Id.* at 571–72 (quoting *Am. Family Mut. Ins. Co. v. Allied Mut. Ins. Co.*, 562 N.W.2d 159, 163 (Iowa 1997)). Ordinarily, issue preclusion will apply if four prerequisites are established: 1) there must be an identity of the issues; 2)

---

**27.** Ordinarily, Courts "look to state law in determining whether to apply issue preclusion." *Liberty Mut. Ins. Co. v. FAG Bearings Corp.*, 335 F.3d 752, 758 (8th Cir.2003).

the issue must have been raised and litigated in the prior action; 3) the issue must have been material and relevant to the disposition of the prior action; and 4) the determination made of the issue in the prior action must have been necessary and essential to the resulting judgment. *Haberer v. Woodbury Cnty.*, 188 F.3d 957, 961–62 (8th Cir.1999) (citing *Dolan v. State Farm Fire & Cas. Co.*, 573 N.W.2d 254, 256 (Iowa 1998)).

■ The PLB was tasked with determining whether substantial evidence supported Defendant's decision to terminate Plaintiff for dishonesty. *See* Def.'s App. at 176–83. The vast majority of the eight page order, however, does little more than recount the positions of the parties in relation to evidence that is essentially the same as the undisputed facts in this case. *See id.* The PLB recites that Plaintiff told Biggerstaff in October 2009 that his knee injury was not work related, Plaintiff filed an injury report asserting that his knee injury *was* work-related in November 2009 and claiming that he was previously unaware of cumulative trauma injuries, and Plaintiff wrote on the injury reporting form that he first became aware that his injury was potentially work-related a "year ago." *Id.* at 179–81. In regard to these facts, the PLB concluded that "substantial evidence was adduced at the Investigation that the Claimant was guilty as charged." *Id.* at 183. Upon review of the entire decision, it appears that this conclusion can *only* have been based on the PLB's determination that, in light of Plaintiff's statement on the injury report form that he became aware his condition was work-related a "year ago," "when [Plaintiff] told his Manager that he need to be off for surgery [on] account of off-duty injuries *he knew that statement was not accurate.*" *Id.* at 181 (emphasis added).

The PLB then went on to discuss Plaintiff's January 4, 2012 deposition where he was questioned about his October 2009 statement to Biggerstaff. *Id.* In that deposition, Plaintiff admitted that he knew his injury was work-related in October 2009 when he spoke to Biggerstaff, but did not tell Biggerstaff because he "was afraid to lose [his] job." *Id.* at 181; *see also id.* at 188. Although it found that such concerns were not entirely unjustified, *see id.* at 181 ("The record indicates that [Plaintiff's] argument [that railroad carriers have "created an Injury Reporting Environment that had a chilling effect on the reporting of on-duty injuries"] is not without some merit[.]"), the PLB nonetheless was "not persuaded that harassment and intimidation played any role in [Plaintiff's] decision not to tell the truth to Manager Biggerstaff in mid-October 2009" because Plaintiff had testified at deposition that he "thought at [the time of the meeting with railroad personnel where he filled out the injury report form] that "everything was just fine. We had a nice discussion. Nobody got real mean." *Id.* at 181–83.

The Court finds that collateral estoppel is inapplicable in this case. The primary problem with Defendant's position is that, even if the Court accepts the relatively few "factual findings" of the PLB, i.e., that Plaintiff lied to Biggerstaff in October 2009, that Plaintiff's lie was not caused by Defendant's harassment or intimidation, and that Defendant was warranted in finding Plaintiff guilty of dishonesty, there is no "identity" between these findings and the issues in Plaintiff's FRSA claim upon which to apply the collateral estoppel doctrine. Indeed, as the Court discussed in *supra* § III.B.1.a., the FRSA prohibits Defendant from discriminating against Plaintiff for his "lawful, good faith act done" to notify Defendant of a work-related personal injury. The fact that Plaintiff may have lied in October 2009 about his

injury *not* being work-related does not establish that Plaintiff lacked good faith when he notified Defendant in November 2009 that his injury *was* work-related. Likewise, the fact that Plaintiff was not harassed when he filed his injury report does nothing to disprove the possibility that Plaintiff's injury report was *a* contributing factor in his discharge.[28] Indeed, even if Plaintiff's dishonesty in October 2009 was the primary and predominant basis for his discharge, this does not preclude the possibility that Plaintiff's injury report could still have been *a* contributing factor in his discharge, as discussed more extensively in *supra* § III.B.1.b.

## IV. CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment (Clerk's No. 21) is DENIED.

IT IS SO ORDERED.

## ORDER

On September 13, 2013, the Court entered an Order denying Union Pacific Railroad Company's ("Defendant") Motion for Summary Judgment. Clerk's No. 35. In particular, the Court rejected Defendant's assertion that an election of remedies provision in the Federal Railway Safety Act ("FRSA") bars Thomas Ray's ("Plaintiff") action because Plaintiff already challenged his discharge from employment with Defendant under the Railway Labor Act ("RLA"). *See* 49 U.S.C. § 20109; 45 U.S.C. § 153. Before the Court is Defendant's Motion to Amend and Certify Order for Interlocutory Appeal Pursuant to 28 U.S.C. § 1292(b) and for a Stay of Proceedings Pending Appeal, filed October 1, 2013. Clerk's No. 36. Plaintiff filed a resistance to the Motion on October 14, 2013. Clerk's No. 37. The matter is fully submitted.

The Eighth Circuit Court of Appeals has held that certification of a § 1292(b) interlocutory appeal is an "extraordinary course," which requires that three criteria be satisfied: " '(1) the order involves a controlling question of law; (2) there is substantial ground for difference of opinion; and (3) certification will materially advance the ultimate termination of the litigation.' " [1] *Union County, Iowa v. Pip-*

---

**28.** The Court is actually somewhat perplexed as how the PLB's conclusion that "harassment and intimidation [did not play] any role in [Plaintiff's] decision not to tell the truth to Manager Biggerstaff in mid-October 2009" is relevant to the FRSA claim at all. *See* Def.'s App. at 183. In fact, the Court is uncertain how the PLB's determination even makes sense in the context of the RLA proceeding before it. In the RLA proceeding, Plaintiff asserted fear of termination as an explanation for *why* he lied to Biggerstaff in October 2009. *See id.* at 181 ("At Claimant's Deposition on January 4, 2012, Claimant was questioned about the statement he made to Manager Biggerstaff in October, 2009. Claimant explained on pages 77 and 102 and 103 of that Deposition that he did not tell Mr. Biggerstaff the truth because he was afraid he might be fired."). Yet in reaching its determination that fear and intimidation did not cause Plaintiff to lie in October 2009, the PLB

relied solely on Plaintiff's testimony that he did not feel intimidated or harassed in a meeting that took place in November 2009—a full month later. *See id.* at 182–83 (PLB decision stating that "[b]ased upon [Plaintiff's deposition testimony regarding the November 2009 meeting where he filled out his injury report] the Board is not persuaded that harassment and intimidation played any role in Claimant's decision not to tell the truth to Manager Biggerstaff *in mid-October 2009* " (emphasis added)).

**1.** The Eighth Circuit also stated in *Union County* that " '[t]he legislative history of subsection (b) of section 1292 ... indicates that it was to be used only in extraordinary cases where decision of an interlocutory appeal might avoid protracted and expensive litigation. It was not intended merely to provide review of difficult rulings in hard cases.' " 525 F.3d at 646 (quoting *United States Rubber*

*er Jaffray & Co., Inc.*, 525 F.3d 643, 646 (8th Cir.2008) (quoting *White v. Nix*, 43 F.3d 374, 377–79 (8th Cir.1994)). After careful review of the parties' submissions on the matter, the Court finds that, even assuming the first element of the test is satisfied, the remaining two elements do not support § 1292(b) certification.

 In its request for certification, Defendant argues the second element—that there is substantial ground for difference of opinion—is satisfied because: 1) the Eighth Circuit has not yet addressed the issue[2]; 2) the Administrative Review Board ("ARB") in *Mercier*[3] concluded that an FRSA action was not barred by a prior RLA action "only after the Administrative Law Judges who handled the two cases in the first instance reached opposite conclusions about the effect of the election of remedies provision"; and 3) the Court's reliance on *Ratledge*[4]—"one non-precedential opinion from an out-of-circuit district court"—is insufficient to "support a conclusion that the novel question presented by this case has been definitively resolved." Def.'s Br. at 4–6. Defendant cites no case law reaching a conclusion contrary to that of this Court, however.[5] Rather, its position appears to be that the ARB

and those courts who have considered the issue decided it incorrectly. The Court finds this insufficient to warrant certification. *See, e.g., All States Freight, Inc. v. Modarelli*, 196 F.2d 1010, 1011–12 (3rd Cir.1952) ("Every litigant against whom [an issue] is decided naturally thinks the judge was wrong. It is likely that in some cases an appellate court would think so, too."); *Kapossy v. McGraw–Hill, Inc.*, 942 F.Supp. 996, 1001 (D.N.J.1996) ("[M]ere disagreement with the district court's ruling does not constitute a 'substantial ground for difference of opinion' with in the meaning of § 1292(b). Rather, the 'difference of opinion' must arise out of genuine doubt as to the correct legal standard."); *First Am. Corp. v. Al–Nahyan*, 948 F.Supp. 1107, 1116 (D.D.C.1996) ("Mere disagreement, even if vehement, with a court's ruling ... does not establish a 'substantial ground for difference of opinion' sufficient to satisfy the statutory requirements for an interlocutory appeal."). Indeed, as Plaintiff correctly points out, Defendant's election of remedies argument "has been argued by the Class 1 railroads and rejected in five out of five deciding courts, at the [ARB], and by a cadre of Administrative Law Judges ... all but one concluding that the argument is

Co. v. Wright, 359 F.2d 784, 785 (9th Cir. 1966)).

**2.** Defendant points out that this Court "has in the past certified a question for interlocutory review when there was a 'lack of Eighth Circuit precedent regarding the issue.'" Def.'s Br. at 5 (citing *Union Cnty., IA v. Piper Jaffray & Co., Inc.*, 248 F.R.D. 217, 225 (S.D.Iowa 2008)). Defendant fails to note, however, that the Eighth Circuit seemingly rejected a lack of case law as sufficient to satisfy the second § 1292(b) element when it determined that this Court's § 1292(b) certification in *Union County* was an abuse of discretion. *See Union Cnty.*, 525 F.3d at 647.

**3.** The *Mercier* case referenced comprised two appeals decided together by the ARB, *Mercier*

*v. Union Pacific Railroad* and *Koger v. Norfolk Southern Railway Co.*, Case Nos. 09–121, 09–101, 2011 WL 4915758 (ARB Sept. 21, 2011).

**4.** *Ratledge v. Norfolk Southern Railway Co.*, No. 1:12–cv–402, 2013 WL 3872793 (E.D.Tenn. July 25, 2013)

**5.** Defendant's lack of case law citations is problematic. *See Union County*, 525 F.3d at 647 ("While identification of a sufficient number of conflicting and contradictory opinions would provide substantial ground for disagreement, the County offered no such Iowa opinions, statutes or rules, and 'a dearth of cases' does not constitute 'substantial ground for difference of opinion.'" (internal citations and some internal quotation marks omitted)).

incorrect or that the affected workers' claims were at least colorable." Pl.'s Br. at 2.

 Perhaps most compellingly, the Court finds that Defendant has failed to demonstrate the third element necessary for certification—that an immediate appeal will "materially advance the ultimate termination of the litigation." Defendant is correct that *if* this Court certifies the matter, and *if* the Eighth Circuit agrees with Defendant's position that the FRSA's election of remedies provision bars Plaintiff's action, "this litigation will end." Def.'s Br. at 6–7. The Court cannot, however, ignore the reasonable likelihood of an alternate outcome, namely that the Court of Appeals would affirm this Court's ruling on the election of remedies issue. Indeed, if this latter scenario comes to fruition, the litigation in this matter will have been dramatically and unnecessarily prolonged, at significant expense to both parties, by an interlocutory appeal. Given that the case is ready to proceed to an estimated five-day trial, the Court sees no particular gain to be had by staying the matter and awaiting a potential interlocutory appeal. Indeed, the ultimate termination of this litigation is likely to occur far more quickly if trial is conducted and the parties present all their claims of error in a single appeal following trial.

For the reasons stated herein, Defendant's Motion to Amend and Certify Order for Interlocutory Appeal Pursuant to 28 U.S.C. § 1292(b) and for a Stay of Proceedings Pending Appeal (Clerk's No. 36) is DENIED.

IT IS SO ORDERED.